48460. LEMMING v. J. P. ROBERTS & SONS, INC. et al.

HALL, Presiding Judge. This is an appeal by Mrs. Pauline Lemming, mother of Jimmy Lemming, deceased, from a jury verdict for defendants in a negligence case arising out of Lemming's electrocution on a construction job in 1967.

The three defendant-appellees are J. P. Roberts & Sons, Inc., (hereinafter, "Roberts") the general contractor on the construction job in Rome, Georgia; Peugh Electric Company, Inc., and Central Electric Company, Inc. (hereinafter, "Peugh" and "Central") electrical subcontractors on the job.

A careful review of the more than 400 pages of trial transcript reveals that Lemming, 18 1/2 years old, was employed in June of 1967 by Latham Plumbing & Heating Company of Rome, Georgia, (hereinafter, "Latham"), not a party here, as a learner to an apprentice plumber and in that capacity on August 23, 1967 was on the job site doing Latham's subcontract plumbing work. He was working in a concrete floored crawl space beneath the building being remodeled. This crawl space was frequently wet

and slimy, but on the day in question it was dry in the area in which he was working. He was sitting on the floor using a Skil rotary hammer (a heavy piece of electrically powered equipment performing drilling and hammering functions on plaster and concrete). When a Latham supervisor went to look for him, he was discovered lying back against a pilaster in the crawl space with the Skil hammer across his lap and one hand upon its motor; he was "groping for air," white and limp. The first act of the supervisor was to unplug the Skil hammer, though later he was unable to say why. Lemming then uttered a groan. He was removed to a hospital where he was treated by Dr. Gray, who determined that he had no pulse nor blood pressure. Despite direct cardiac massage and other vigorous medical efforts, he died.

Dr. Gray testified that his condition was consistent with electrocution or with heart attack, drowning, or other cause of sudden heart stoppage. Dr. Gray had been told before beginning treatment that Lemming had been electrocuted and at that time the cause of death was concluded to be cardiac arrest secondary to electrical shock. No autopsy was performed, and the hospital had not examined the body for burns; but the embalmer testified that he found severe burns across the palms of both hands.

The evidence concerning the electrical system into which the Skil hammer was plugged was that the initial installation of the "temporary" wiring had been done by Peugh to provide light for the workmen. It was a 2-wire system, that is, not the safer 3-wire system in which the third wire is a ground. Sockets were present for lamps, but no receptacles were provided into which to plug electrical implements. Peugh was then replaced by Central as the electrical subcontractor. Central extended the temporary wiring into other corridors of the building, continuing the 2-wire system. The evidence tended to show that all power provided through the system of wires into which Lemming's hammer was plugged had been provided by Central. Central then added receptacles into which the workmen could plug portable power tools. Three-prong receptacles were used, apparently by happenstance; the Central foreman testified, however, that had he been given a choice he would have chosen the latter because either a two or three prong plug could be plugged into a three-prong receptacle.

The Skil hammer Lemming was using had only two prongs, the third or ground prong having been broken or cut off. Also, the

Skil hammer was plugged into a Latham drop cord (extension cord) which was a 2-wire cord as were all of Latham's drop cords, and the drop cord was plugged into the three-prong receptacle furnished by Central. The evidence showed that when an appliance with a two-prong plug is plugged into a receptacle on an electrical circuit it makes no difference whether the circuit is 2 or 3 wires: even if it is a 3-wire grounded circuit, the ground is lost because the absence of the third or ground prong breaks the grounding portion of the circuitry. The same effect of eliminating any grounding capacity of the circuit results from using only a 2-wire drop cord to the appliance.

Plaintiff adduced evidence that a device known as a ground fault detector or ground fault interrupter existed at the time of the occurrence and had the capacity to perform on a 2-wire as well as a 3-wire system. The function of this device is to detect the presence of a short circuit or "leak" of current to some ground other than the return wire, and to shut off the current within such a short time that electrocution would not occur. However, this device was not shown by the evidence to have been generally used or known in the business at the time of the occurrence, nor was it shown to be well understood even by most of plaintiff's witnesses who testified concerning it.

Evidence concerning the Skil hammer itself showed that in addition to the missing third prong, insulation on the cap covering one of the motor brushes was missing, and contact with this uninsulated current-carrying portion of the hammer could cause power to pass through the user's body to ground. An electrician testified that should this happen no 3-wire system, ground fault detector or other device would prevent a shock to the user. The evidence also showed that the rubber grommet positioned where the cord came into the handle was defective, and that such a condition could cause a short circuit from the wire to the metal casing of the appliance and produce a shock and hand burns.

The jury returned a verdict for all defendants, and plaintiff-appellant raises 21 enumerations of error. As will be discussed below, we hold that on the evidence presented a directed verdict for defendants should have been granted. Such a motion was made at the close of plaintiff's case and was denied. No error is alleged on this point, as defendants won a verdict from the jury; nonetheless we hold that a jury verdict for plaintiff would not have been authorized by the evidence, and for this

reason, it will not be necessary to consider those of appellants' enumerations which complain of jury charges and related matters. This disposes of enumerations alleging error in the court's charges to the jury; the court's refusing to allow the jury to take out with them a certain bookmarker by which plaintiff sought to mark certain sections of the electrical code which was introduced into evidence; the court's failure to instruct the jury fully on their proper behavior outside the courtroom each time they went out; the court's alleged expression of opinion to the jury that the argument concerning the ground fault detector was an afterthought of plaintiff; a claim that the charge as a whole was unfavorable to plaintiff because 28 out of 38 pages of the charge emphasized defenses; and an allegation that the charge unduly emphasized the recency of plaintiff's amendment incorporating allegations of negligence for failure to utilize a ground fault detector. Any error in these circumstances was harmless. See *Tolnas v. Pope,* 212 Ga. 50 (3) (90 SE2d 420); *Owens v. Service Fire Ins. Co.,* 90 Ga. App. 553 (3) (83 SE2d 249). This disposes of Enumerations 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 17, 18, 19, and 20. Enumerations 13, 14 and 16 were not preserved by objection at trial. *Andrews v. Commercial Credit Corp.,* 129 Ga. App. 294, 297 (199 SE2d 383). Apparently through mischance there is no Enumeration 15. This leaves for our determination Enumeration 1 alleging error in overruling plaintiff's amended motion for new trial, Enumeration 2 alleging that the verdict was contrary to the evidence, and Enumeration 21 alleging error in the admission of testimony that normal custom and practice in the construction industry is that a 2-wire system is used for temporary wiring.

We consider first whether the evidence supported the jury verdict.

The allegations of negligence against defendants as reflected in the amended complaint involve alleged failure to provide a 3-wire system; failure to warn deceased that there was no 3-wire system; failure to warn of the alleged dangers of using power tools in the absence of a 3-wire system; failure to abide by the electrical code which was incorporated into the Rome City Ordinances requiring a 3-wire system for temporary wiring; failure to provide a safe place to work; failure to install a ground fault detector; and failure to warn of the absence of a ground fault detector.

The evidence clearly showed with respect to the failure to provide a 3-wire system that this point became completely moot at the moment deceased plugged into the three-prong receptacle a 2-

wire drop cord into which he plugged his hammer, also with only two extant prongs. This would have eliminated the system's ground had a 3-wire grounded system been used. Therefore, assuming without necessarily deciding that defendants were negligent in using a 2-wire system, nonetheless this negligence could not have been the proximate cause of deceased's injury. Nor can we conclude that he was forced to use a 2-wire drop cord and hammer because defendants' 2-wire system would accommodate only that. The evidence was to the contrary: that had deceased had a 3-wire drop cord and hammer he would have been able to use them because the receptacles on defendants' system had three holes.[1] This means that the use of a 2-wire drop cord and a 2-wire hammer was not required by defendants' 2-wire system.

Assuming that plaintiff's deceased died by electrocution, there is no evidence of a cause of electrocution other than possible malfunction in the Skil hammer he was using, provided by Latham which is not a party here. On the facts before us reasonable persons must conclude that deceased's drilling equipment was simply unable to take advantage of the safety benefits of a 3-wire system had such a system been provided by defendants. Therefore, plaintiff may not prevail on charges of negligence in failing to provide a 3-wire system, and in failing to warn of its absence and of possible dangers of using power equipment with such a system.

This leaves for consideration defendants' failure to employ or to warn of the absence of a ground fault detector. We hold that as a matter of law on the facts here, such failure cannot create an issue of negligence for the jury.

"[E]xcept in extraordinary circumstances the law does not require that one employ the safest of all possible procedures in order to avoid tort liability. . . Failure to adopt and use a mechanical

---

[1] Naturally, the third hole in the receptacle, without a 3-wire system, provides no ground; however, the presence of the third hole is evidence (and there is also other evidence) that the mutilation of the Skil hammer plug was not required by defendants' receptacle which could have accommodated the third prong had it been present. Had Lemming been electrocuted while using unmutilated 3-wire equipment, the proximate cause might have been defendants' failure to provide a 3-wire system.

device is not negligence in the absence of proof of its utility and availability." 65 CJS 1016, 1019, Negligence, § 84; accord, id. p. 472, § 2 (9). "Subject to some limitations, perhaps, it seems to be generally conceded that negligence is not established by showing that an injury might have been prevented by the use of some device or precaution that has not yet been generally adopted." 57 AmJur2d 432, Negligence, § 81. The rule in Georgia is that even with dangerous instrumentalities such as electricity, the duty is that of ordinary care under all the circumstances, and not extraordinary care as a matter of law. *Hand v. Harrison,* 99 Ga. App. 429 (3) (108 SE2d 814). This duty is ordinarily performed by using the best known and most extensively used appliances and equipment. *Heidt v. Southern Tel. &c. Co.,* 122 Ga. 474, 478 (50 SE 361); *Davis v. Augusta Factory,* 92 Ga. 712, 713 (18 SE 974); *Higgins v. Cherokee R.,* 73 Ga. 149, 164; *Ga. Power Co. v. Stonecypher,* 47 Ga. App. 386 (170 SE 530).

Plaintiff's evidence with respect to the ground fault detector included the testimony of Troy Ward, who had been foreman on this job for both Peugh and Central but who was plaintiff's witness. He testified that as of July 1967 he had known of a ground fault detector, but "I don't know whether it was available locally or not, because I do know for a fact that the first one that was installed in the City of Atlanta was installed sometime in '68. That was the first one that came into Atlanta. A former boss of mine installed it in a swimming pool." Ward also gave his understanding that the device could only be used with a 3-wire system, and stated that he had never seen a ground fault detector. He said that to the best of his knowledge the device was not on the market at the time Lemming died; that he had made inquiry of local distributors and had been told that it first became available in 1968. Plaintiff also called as a witness Allen Ivey, a consulting engineer with a background in electrical en-gineering. He testified that the ground fault detector had been patented in May of 1963, and was on the market continuously from the latter part of that year; that it would operate on a 2-wire system; that it would have been sufficient to prevent electrocution of a user of equipment which develops a short circuit; that Ivey was unsure whether he had ever electrically inspected any construction jobs in Rome, but in any event prior to the date of Lemming's death he had never seen a ground fault detector on any construction job in the Rome area; he knew of no reason why such a device should not have been obtainable

prior to the date of Lemming's death. J. F. Briggs, electrical inspector for the City of Rome, testified that prior to Lemming's death he had never seen a ground fault detector in use in Rome; he could not say definitely that he had even heard of a ground fault detector prior to that time, and that there were none in Rome at that time or, to the best of his knowledge, at the time of trial.

Under the authorities cited above this record is inadequate as a matter of law to authorize a jury inference that defendants were negligent in not having a ground fault detector, because the detector was not shown to have been available or generally adopted, and by no means was it shown to have been the best known and most extensively adopted equipment.

Having thus as a matter of law eliminated this last possible ground of defendants' negligence, we rule that a judgment for defendants was demanded.

What has been said above also disposes of Enumeration 21: As the failure to employ 3-wire system was not the proximate cause of death, it can make no difference whether such failure was or was not customary practice in the construction industry.

Enumeration 1, complaining of the overruling of plaintiff's new trial motions, is without merit, each and every asserted ground for new trial having been enumerated as error and disposed of by the foregoing discussion.

*Judgment affirmed. Clark, J., concurs. Evans, J., concurs in the judgment.*

ARGUED SEPTEMBER 13, 1973 — DECIDED JANUARY 9, 1974.

*Mundy, Gammage & Cummings, E. Lamar Gammage, Jr., William W. Mundy,* for appellant.

*Matthews, Walton, Smith, Shaw & Maddox, Oscar M. Smith, John M. Graham, III, Neely, Freeman & Hawkins, Joe C. Freeman, Jr., W. G. Tabb, III,* for appellees.