Eleanore Higginbotham ARETZ, Thomas F. Aretz, Carolyn W. Roberson, Josephine Walker, Jean Marie Thomas, Rubynell Cox, Harriett Perry, Laura Pinkney, Mrs. Bonny Chapman, George E. Sullivan et al., John Hill, Jr., Herman Costello Roberts et al., Harold Anderson, Shirley A. Overstreet, Malissa James Hutchinson, Ethel Lee Fields, Shirley Albertie, Leon W. Key, Henry Bateman, Claudia Mae Jacobs, Anna L. Roberts, Lille B. Johnson, Willie Mae Parland, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Flossie Marie MASSEY, Ruby Mae Anderson, Tyrone Black, Angie L. Brown, Deloris Mae Butler, Mary Lee Chance, Lydia Cobbs, Noami A. Cooper, Luberdia Davis, Lillis Dawson, Leiler Gaines, Murriell Glover, Henry Lee Haywood, Nadine Hopkins, Juanita O. Livingston, Willie M. Rainey, Eliza Rudolph, Alean Small, Ida Bell Smith, Ernie Steele, Lucille Washington, Carolyn Waye, Claude Way, Hennette Way, Loretta Williams, Jimmie L. Alberta, Albert Austell, Noah Banks, William Booth, Louis Burch, Tony Burch, a Minor, By Next Friend Louis Burch, Vercie Campbell, Leroy Dawson, Mildred Ellis, Sam E. Fuller, Vera Jackson, Promes Life, Jerome Lucas, James Rauls, Rodney Rauls, a Minor, By Next Friend James Rauls, Mack Taylor, and Dolly Young, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. Nos. 1158, 1159, 1162, 1163, 1165 to 1169, 1222 to 1235 and 1161.

United States District Court,
S. D. Georgia,
Brunswick Division.

June 23, 1977.

See also, 456 F.Supp. 397, 604 F.2d 417.

Frank P. Brannen, Savannah, Ga., for plaintiffs.

Edmund A. Booth, Jr., Augusta, Ga., Darci L. Rock, Trial Atty., Torts Branch, Civ. Div., U. S. Dept. of Justice, Washington, D.C., for defendant.

LAWRENCE, Chief Judge.

### INDEX

**PART ONE**                                   **Page**

(1) OUTLINE OF CASE .................................... 264–265

(2) THE THIOKOL CONTRACT AND GOVERNMENT
PROCUREMENT PROCEDURES ........................ 265–268

(3) THE TRIP FLARE FACILITY BEFORE
THE EXPLOSION ...................................... 268–269

(4) ILLUMINANT PRODUCTION PROCESS .................. 271–272

(5) BLACK WEDNESDAY AT WOODBINE ................... 272–273

(6) THE FACILITY: AFTER THE EXPLOSION
(THE THIOKOL INVESTIGATION) ...................... 273–275

(7) DOD SAFETY STANDARDS ............................ 275–277

(8) THE CLASSIFYING OF ILLUMINANTS ................. 277–279

(9) DISSIDENT VOICES .................................. 279–280

(10) THE 1968 THIOKOL (WASATCH) TESTS ................ 280–281

(11) THE ROLFE REPORT,
BRITISH MINISTRY OF DEFENSE ..................... 281

(12) CLASS 2 UPGRADED IN THE CASE OF VARIOUS
PYROTECHNIC COMPOSITIONS ....................... 281–282

**264**

PART ONE                                   Page

(13) FAILURE TO NOTIFY THIOKOL OF THE DECISION
     TO UPGRADE DECISION .............................. 282–284

(14) CONTENTIONS OF PARTIES

    (A) Plaintiffs' ........................................ 284

    (B) Defendant's ....................................... 284

(15) THE LAW: A CONSPECTUS

    (a) Thiokol's Status as an Independent Contractor and
       the Legal Consequences thereof in this Case .............. 285–286

    (b) The Discretionary Function Exception ................... 286–288

    (c) Liability of Employers Contracting with Independent
       Contractors for Inherently Dangerous Work .............. 288–289

    (d) Proximate Cause ................................... 290

PART TWO

(16) WAS THE UNITED STATES NEGLIGENT? .............. 290–293

(17) WAS THE NEGLIGENCE OF THE GOVERNMENT A
    PROXIMATE CAUSE OF THE EXPLOSION? .............. 293

    (A) NEGLIGENT ACTS OF THIOKOL AS
       INTERVENING EFFICIENT CAUSE
       OF EXPLOSION .................................. 293–297

    (B) WOULD THE NECESSARY CHANGES IN SAFETY
       STANDARDS REQUIRED BY THE CLASS 7
       DESIGNATION HAVE BEEN IMPLEMENTED
       BEFORE THE EXPLOSION IF THIOKOL HAD
       BEEN TIMELY NOTIFIED OF THE ARMY'S
       RECLASSIFICATION? ............................. 297–299

PART THREE

FINDINGS OF FACT AND CONCLUSIONS OF LAW

    I. FINDINGS OF FACT ................................ 299–301

    II. CONCLUSIONS OF LAW ........................... 301–303

## OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

### PART ONE

### (1)

### OUTLINE OF CASE

These Federal Tort Claim actions have resulted from the fire and explosion which occurred at the Woodbine, Georgia plant of Thiokol Chemical Corporation on February 3, 1971.

Thiokol was engaged in the manufacture, under contract with the Army, of trip flares which were used by the military during the war in Viet Nam as an aid to troops subjected to attack at night. The flares are ignited by pulling the trip or cutting of the trip wire. A bright flame is emitted which lights up a considerable area.

On February 3, 1971, around 60 employees of Thiokol were working in or near Building M–132 in which the flares were produced. At 10:53 A.M. a fire broke out at the "first fire" addition station in the facility. The loose illuminant material (magnesium and sodium nitrate) burns at a speed measured in milliseconds and reaches very high temperatures. The fire ran down the ignition pellet assembly line and eventually got into the cure room where 8,000 pounds of loose illuminants were being cured in trays. Also in the curing room were 56,322 candles containing approximately 0.3 pounds of illuminant each; 18,472 ignition pellets, and 100 pounds of first fire and intermediate mix.

An enormous pressure built up as the result of the deflagration of the illuminants. The fire culminated in an explosion in the cure room that destroyed the build-

ing. Twenty–nine employees lost their lives. More than fifty other employees were injured. The amounts sought by the plaintiffs aggregate $717,526,391.

The action against the United States by the injured employees and representatives of deceased employees is brought under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and §§ 2680 *et seq.* In many instances Thiokol Chemical Corporation (hereafter Thiokol) was named as a party defendant along with the United States. The Company was covered by workmen's compensation insurance and its carrier paid the many claims in accordance with the Georgia Act. That statute provides the exclusive remedy against an employer of an employee injured in the course of his employment. The Negro plaintiffs challenged the constitutionality of the Workmen's Compensation Act on the ground that the average–weekly–earnings basis of computing compensation payments discriminates against low income employees in violation of the equal protection clause of the Fourteenth Amendment. That contention was denied on December 21, 1973. Thiokol was dismissed as a defendant. See *Massey et al. v. Thiokol Chemical Corporation and United States,* 368 F.Supp. 668 (S.D., Ga.).

After extended discovery, the case was tried on the *liability* issue alone at a trial which lasted approximately three weeks during June, July and August, 1974. The record in this case is over 7,500 pages long. It includes pleadings, interrogatories and answers, depositions, reports, photographs, manuals, drawings, treatises, films and many other materials.

There is no transcript of the testimony with the exception of that of one witness. Apparently a transcript of the trial was not ordered by counsel. However, most of the witnesses had given lengthy depositions. They were introduced in evidence and are before the Court as a part of the record. The tapes of the testimony of other witnesses are available. I have listened to relevant parts of the recordings of what witnesses, previously not deposed, testified to at the trial. Unfortunately, the testimo-ny of one of the Government witnesses, Dr. Francis R. Taylor, was not recorded. The failure was apparently due to malfunction of the machine or to some error by the Reporter who is now deceased. He took no stenographic notes of the evidence. The pretrial depositions do not vary in any material way from what is found in the depositions. As I recall, no effort was made by counsel for either side to question such witnesses as to any disparity.

(2)

## THE THIOKOL CONTRACT AND GOVERNMENT PROCUREMENT PROCEDURES

(A)

Early in the 1960's Thiokol established a plant at Woodbine, Georgia. One segment of its widespread business activities was known as the Aerospace Group. For some years the Company had specialized in advanced propulsion systems for missiles and space vehicles. It has engaged in the production of rocket components, flares and ordnance devices. At the time the Woodbine operation commenced the space program was concentrated on landing unmanned and manned space vehicles on the moon.

Camden County was selected as the site of the Company's plant for the manufacture of very large solid propellant motors. Woodbine was remote from any metropolitan area and was accessible to the water for shipment of engines and fuel to Cape Kennedy.

In 1965 the National Space Program decided against the use of solid propellants and the Government withdrew financial assistance to Thiokol. The Company converted its Georgia facility to the production of various materials, including specialty chemical and ordnance systems for the military.

On October 1, 1969, Thiokol entered into the contract with the United States through the Department of the Army to manufacture 754,000 M 49 A1 surface trip flares. The contract was made pursuant to

an Invitation for Bids sent by Picatinny Arsenal, Dover, New Jersey, the designated contracting office, to various proposed manufacturers. To it was attached a Technical Data Package containing the specifications for the item to be produced. Seventeen manufacturers submitted bids. Thiokol was the lowest bidder.

The chain of command for procurement of the contract in question is as follows:

```
          Department of Defense (DOD)
                    |
          Department of the Army (DA)
                    |
          Army Materiel Command (AMC)
                    |
          Munitions Command (MUCOM)
       [now Army Munitions Command (ARMCOM)]
                    |
    _____|_____
   |                |                |
Army Procurement  Picatinny        Other
Supply Agency (APSA)  Arsenal (PA)  Arsenals
```

The procurement in the present case originated with the Department of the Army and went down the chain of command to AMC and MUCOM. Picatinny Arsenal was the Procuring Contracting Office for privately–owned, privately–operated (POPO) plants. APSA was primarily responsible for procurement at Government–owned, contractor–operated (GOCO) facilities.

DCASR is a joint service organization. It is set up as an entity within the DOD to administer military procurement contracts at the field level. Eugene C. Heckler was the Administrative Contracting Officer (ACO) in Atlanta. He was assisted by legal, safety and industrial specialists and quality assurance personnel. DCASR–Atlanta had authority over Government personnel stationed at the Woodbine plant. The head of such detailed personnel was Herbert Boyd, the Contracting Officer's Representative (COR). Mr. Boyd's function was one of quality assurance to endeavor to insure that the Government obtained a quality end product.

C. F. Otken of the Picatinny Arsenal was the Procuring Contracting Officer (PCO). The division of function between the ACO and the PCO in this contract was as follows. The PCO was the ultimate contract administrator and made arrangements for produc-

tion or engineering assistance from Picatinny Arsenal if Thiokol needed same. The ACO was responsible for on–site quality assurance, field contract administration, and safety. The safety involvement of the ACO was to make pre and post–award safety surveys. The latter consisted of annual safety surveys of the plant. Thiokol could call upon the ACO for safety advice or assistance if needed, and the ACO could call upon the PCO for safety assistance.

If the Contracting Officer's Representative (COR) observed a safety violation, he could request the contractor to remedy it immediately or advise the ACO. After the COR dealt directly with the contractor, he would advise the ACO in the event the contractor did not remedy the violation. The ACO could then deal directly with the contractor or have his safety personnel do so. If no remedy was achieved, the ACO would report the violation to PCO, who would intervene. The ACO could also order the quality assurance people out of the plant. This would have the effect of shutting down production. The PCO could default the contractor and terminate the contract.

After it was determined that Thiokol was the low bidder for the trip flare contract, Mr. Otken sent a pre–award survey form to the commanding officer of DCASR–Atlanta. The form requested that a pre–award survey of Thiokol be conducted to determine whether it could comply with the terms of the contract. A safety survey was performed on October 28, 1969, by Theron W. Driscoll, Chief, Office of Specialized Safety, DCASR–Atlanta. It indicated Thiokol would meet the safety requirements of the bid package. Building M–132, where the manufacturing was performed and in which the February 3, 1971, fire began, was empty at the time of the survey. However, DCASR accepted the contractor's assurances that it was capable of performing the work.

DCASR–Atlanta recommended approval of an award to Thiokol on November 5,

1969, and Mr. Otken certified its responsibility on November 25, 1969. The award was made and the contract was let under a document signed by Mr. Otken on December 12, 1969, effective as of December 2, 1969. On December 22, 1969, Thiokol requested its first delay in the contract time schedule relative to the date for submission of a first article for testing by the military.[1] Thiokol's original submission for first article approval was rejected and a request for further delay was made, this time in reference to the delivery schedule for the finished end–item flare.

By August 12, 1970, production had begun on the M49A1 trip flare. This was ascertained by Stephen P. Carl, Office of Safety, DCASR–Atlanta, during a pre–award survey in conjunction with a contract for manufacture of an 81 mm. illuminating round. He also indicated that Thiokol was producing the trip flare and CS–2 Riot Control Agent at the same time and that both contracts were scheduled for completion in October, 1970.

(B)

The Department of Defense "Contractors' Safety Manual for Ammunition, Explosives and Related Dangerous Material" (October, 1968), Pl. Ex. 2, is integrated with Thiokol's contract. It provides:

"103. Responsibilities

a. The Procuring Contracting Officer (PCO) is responsible for:

(1) Providing safety clauses and technical safety data in contracts for ammunition, explosives and related dangerous materials, using this manual, in whole or in part, as appropriate.

(2) Seeking counsel or advise of the cognizant DoD Component safety staff to insure that adequate safety criteria are included in the contract.

(3) Having pre–award safety surveys conducted to determine that the contractors can meet the applicable criteria contained herein.

(4) Evaluating conditions found during pre–award surveys of contractors plants. When the applicable safety criteria cannot be met, and only upon authority of the cognizant DoD Component, amend the contract to reflect the authorized waivers or exemptions (see para 104).

(5) Requiring the contractor to provide site and construction plans for review under conditions set forth in paragraph 105.

(6) Taking appropriate action on safety matters reported by the ACO.

b. The Administrative Contracting Officer (ACO) is responsible for:

(1) Assuring that the contract contains safety clauses and technical safety data and that the contractor complies with same; reporting noncompliance to the PCO.

(2) Seeking advice of the safety organization of the cognizant DoD Component on matters relating to safety.

(3) Performing pre–award safety surveys when requested by the PCO.

(4) Forwarding requests for waivers or exemptions in accordance with para 104, with appropriate recommendations."

The Manual states that "For contractor owned contractor operated plants, it is the responsibility of the Procuring Contracting Officer to determine the acceptable protection after considering the hazard involved and the risk that must be assumed."

The purpose of the DOD Manual is to prescribe "safe methods, practices, and standards for insuring continuity of production, safe–guarding personnel, and prevent-

---

1. First article submission is a technical facet of military procurement. Basically, where an item is to be produced, the military wants to check a completed article for conformity with field performance criteria. A contractor must make additional submissions until the "first article" is approved. If the contractor deviates in any substantial way from the specifications of the Technical Data Package after production has begun, a new first article submission must be made.

ing property damage at contractor operated plants." See Para. 103.

The Contractors' Manual classifies manufacturing hazards. Class 2 is a fire hazard. See Para. 707. It embraces:

"Items which burn vigorously with little or no possibility of extinguishment in storage situations are class 2. Explosions normally will be confined to pressure ruptures of containers and will not produce propagating shock waves or damaging blast overpressure beyond the magazine distances specified for this class. There may be a severe hazard of the spread of fire from tossing about of container materials, burning propellant, or incendiary materials. Toxic effects normally will not exist beyond the inhabited building distances specified for this class."

The most hazard is Class 7 (Mass Detonating Hazards). See Para. 709. Items in this classification are defined as

"Those, most of the entire quantity of which will explode virtually instantaneously when a small portion is subject to fire, to severe concussion of impact, to the impulse of an initiating agent, or to the effect of a considerable discharge of energy from without. Such an explosion normally will cause severe structural damage to adjacent objects and the direct propagation of the detonation to other separated explosives and ammunition placed sufficiently close to the initially exploding pile."

In the case of Class 2 hazards where over 20,000 pounds of the material are involved the site must be 190 feet from a public road. For Class 7 hazards there must be barricades and minimum distances between magazines depending on the net pounds of explosives involved.

Among the provisions incorporated by reference in the contract is the following disclaimer of responsibility on the part of the Government for the safety of the public and its personnel:

"(d) Neither the requirements of this clause nor any act or failure to act by the Government in surveillance or enforcement thereof shall affect or relieve the Contractor of responsibility for the safety of his personnel and his property and for the safety of the general public in connection with the performance of this contract, or impose or add to any liability of the Government for such safety. The Contractor is not entitled to rely on the requirements of this clause or on any Government surveillance or enforcement thereof, or lack thereof, or granting of any waiver of exemption in accordance with DOD 4145.26M in discharging the Contractor's responsibility." Pl. Ex. 104, Armed Services Regulation, 7–104.79.

(3)

## THE TRIP FLARE FACILITY BEFORE THE EXPLOSION

Building M–132 was constructed in 1964 as part of Thiokol's anticipated manufacture of rocket motors. It was a rectangular, one story structure, 36'8" × 134'8". Three outside walls were 8" concrete block. The north wall was a weak wall designed to serve as a gas relief in the event of fire. It would blow out an internal pressure of 0.5 psi. The building was considered a logical facility for production of trip flares. A cure room and storage room were added to M–132 in 1970. The loading area was enclosed. It was referred to as the east porch.

M–132 was connected and formed a single complex with Buildings M–142 and M–143. They are connected by covered rampways. The buildings in relation to each other, including the nearby maintenance building, are shown in the diagram below:

## BUILDING M–132 AND VICINITY

The building was subdivided into eight bays each 12′ × 15′ with 12″ reinforced concrete dividing walls on three sides; the fourth side opened into the north corridor of the building. The bays were in groups of two with a 5′ hallway between each group. The hallways extended from the north corridor to the south corridor of the building. The bay walls were reinforced with # 4 bars on 12″ centers in each direction and in each face. The roof of the basic building was constructed of cement asbestos sandwich panels (1%6″ thick) covered by built–up roofing and supported by structural steel roof purlins. It was designed to blow off at 0.5 psi internal pressure. Thiokol Investigation Report, p. 9.

The cure room was constructed in April, 1970, by building two new walls and using the existing walls of 8″ concrete block. There were two doors. The dimensions of the room were 35′6″ × 22′6″ and approximately 10 feet in height–about 8,000 cubic feet.

The sketch below shows Building M–132 and its interior layout:

(4)

## ILLUMINANT PRODUCTION PROCESS

The manufacture of trip flares took place mainly in Building M–132. The manufacturing operations consisted of the following separate processes:

Illuminant Manufacture

First Fire and Intermediate Mix Manufacture

Illuminant Pellet Manufacture

Ignition Pellet Manufacture

Case Lining

Candle Assembly

Cover Pressing Assembly

The production processes can be divided into two basic steps: (1) the manufacture of ignition and illuminant pellets; (2) the candle–loading process.

The raw materials used in the manufacture of flares are ground sodium nitrate, magnesium powder[2] and a binder consolidator (Laminac). Sodium nitrate is the principal oxidizer; magnesium the solid fuel. The loose materials burn at a speed measured in milliseconds. The mix which makes up a flare consists roughly of approximately 45% each of magnesium and sodium nitrate and 8% to 10% of "first fire" material composed of boron powder and barium chromate. First fire is not an illuminant; it is a pyrotechnic and provides the fire that ignites the illuminant more rapidly. Deposition of William L. Childers, p. 50.

The raw materials used in the manufacture of the flares were delivered to Building M–132 and stored at the rear of Bay 101.[3] The grinding process and mixing were conducted in that Bay. The material was mixed in 500 pound batches. The illuminant composition was then granulated or screened in Bay 106 and spread on aluminum trays to a thickness of about one inch. Each tray held about 12.5 pounds of illuminant. The trays were placed in racks and the loose composition transferred to the curing or "oven" room for a minimum period of 16 hours at a temperature of approximately 110 ° F. After cure, the illuminant was again granulated in Bay 106; collected in aluminum buckets, and transferred to fibre containers as required for "surge" or pelleting operations. It was placed in large plastic drums called lever packs. Following further granulation, the illuminant mixture was placed on trays and returned to the oven room for a second curing after which it was transferred to Bay 108. There it was pressed into pellets (200 per tray) and inspected. They were reloaded into the lever packs and stored in a corridor between Bays 106 and 107 pending removal to the head of the candlemaking line. The illuminant material was then taken to Bay 105 where it was stored until needed for dispensement at the "first fire" belt in front of Bays 103 and 104. After the dispensing procedure, the illuminant was loaded into dies which were moved by conveyor belt to the "first fire" addition station.

The "first fire" raw material were delivered to the oven for storage and then transferred to the mixing area at Bay 101 where it was ground, weighed and mixed. After screening, it was moved into the cure room for drying and storage and thence taken to Bay 105 where it was stored in small quantities of 20 to 25 pounds. In quantities of one pound the first fire material was removed to the first fire addition station where it was added to the dies previously filled with the illuminant. After pressing, they were ejected and placed on trays containing 150 pellets per tray and returned to the oven room for storage.

The illuminant casings were placed at the head of the candlemaking line. The illuminant loading assembly consists of three illuminant pellets and an ignition pellet bonded into a lined aluminum alloy case about 1.5" in diameter and 4.1" long. The total illumi-

---

**2.** A metallic element used in pyrotechny because of the intense white light it produces on burning.

**3.** The production process as described below is taken from the report of the Special Investigators of the Alcohol, Tobacco and Firearms Division, United States Treasury Department, Pl. Ex. 101, pp. 3–4 and the Thiokol Investigation Report, Pl. Ex. 6, pp. 14–15 and B–1, B–3 and B–4.

nant in each loading assembly is about 0.3 pound. The cover assembly is pressed on the top of the illuminant loading assembly. The illuminant loading assembly was commonly referred to as a "candle" and the unit with the cover assembly installed as a "flare". The term "candle" is a trade name for the illuminant that has been consolidated and is ready to use as an "end item".

(5)

## BLACK WEDNESDAY AT WOODBINE

On February 3, 1971, 60 to 64 employees began work on schedule at 8 A.M. at the flare facility in Building M–132.[4] On the previous day 6,700,000 ignition pellets and 6,000 candles had been produced and had been placed in the oven for storage. Eight mixtures of illuminant No. 2 had been produced and were placed on the racks and left in the cure room for the purpose of drying. Nothing unusual occurred on the morning of the 3rd until approximately 10:50 A.M. There had been small fires at the ejection station on two or three occasions during the two months preceding the catastrophe.

The procedures at the first fire dispensing station were thus described by an employee who worked there:

"Two operators worked at the first fire addition end of the ignition pellet line. One was referred to as the 'first fire dispenser' and the second as the 'die turn–around operator'. As the dies charged with illuminant approached the station from the illuminant dispensing station, the die turn–around operator lifted the die from the belt and placed it on a plywood board. The board had been affixed to the conveyor frame over the belts to provide a stationary pad for adding the first fire and to prevent spilling material onto the belt. The first fire dispenser dipped first fire material from a conductive plastic container (capacity: 400 grams) with a small brass scoop and leveled the material in the scoop by drawing the top of the scoop across a plastic bar located over the plastic container. She then turned and dumped the scoopful of material into the die on top of the illuminant.

"The die turn–around operator shook the die gently to level the material in the die and placed the die on the return belt of the conveyor for transport to the presses." See Pl. Ex. 6, App. B–3.

Carolyn Waye was the operator at the first fire addition station. Sandra Rawls who lost her life was the die "turn–around" operator on the assembly line. The investigation report made by the special investigators of the Alcohol, Tobacco and Firearms Division states that Sandra would remove the dies from the conveyor belt containing the illuminant material and place them on the plywood board above it. Mrs. Carolyn Waye would dip the first fire material and insert it into the candles. Sandra picked up a die, shook it to level the material, and placed the dies on the opposite belt. To quote from the report: "Carolyn Waye stated that she had just filled up her dipper and was turning toward the belt when she observed a spark come up out of the belt on her side of the wooden board. Mrs. Waye further related that Sandra Rawls was standing at her position at this time and that she (Waye) could not remember if Sandra Rawls had a die in her hand. Mrs. Waye related she and Sandra Rawls left the building through a door next to their station and that she heard three explosions; one that sounded like a shotgun blast, the second a louder explosion, and the final explosion being the biggest and loudest of all."

Thomas F. Aretz was working in the building as Process Inspector, Quality Control. He testified that the fire built up as it went along, "got bigger and burned hard-

---

4. "Immediately preceding the fire, there were 55 people in Building M–132; one person outside of M–132 at the transportainer used for first fire screening; 14 people in the trailer adjacent to M–132; 14 people in M–142; and 3 people in M–143. The approximate location of people in Building M–132 immediately preced- ing the incident is shown in Figure 5. The five people in Bay 108 and all persons in M–142 and M–143 were assigned to the 81mm illuminating projectile program. The others were assigned to Trip Flare production." See Thiokol Report of Investigation.

er", feeding on the material and things that were in its path. He said that the fire travelled to the inspection table of the first fire pellets and the containers of material in its path and followed them through the corridor over to the oven. He did not see how the fire got into the cure room doors. Aretz said that the interval between when he first saw the fire at the ejection machine and the first small explosion was very short–two or three seconds. The interval between then and the explosion that blew him into the air was three or four minutes as best as he could recall. See Mr. Aretz's statement to the Court in the course of the testimony of Dr. J. H. McLain, pp. 94–97, 101–102.

At 10:30 operations on the pellet line were proceeding smoothly. What shortly followed is thus summarized in the report of the Investigation of the Fire and Explosion:

"At approximately 10:53 a. m. a fire started in the north corridor of the building at the west end of the ignition pellet line. At this point, the die turn–around operator would take a die of alluminant from the conveyor belt and place it on a board shelf affixed to the conveyor frame over the belts. The first fire dispensing operator would then add a scoopful of first fire to the die. The operator at this station reported that just as she was adding the first fire material to a die that a fire seemed to come 'right from the board itself'. The fire spread rapidly to dies at the first fire station and down the ignition pellet line. Personnel in the north side of the building immediately evacuated. One operator, who was in the mixer bay on the northwest corner of the building, went to Building M–142, pounded on the door hollering fire, and then ran to the woods north of M–142.

"Personnel on the south side of the building became aware of the fire by the shouts and by observation of a very bright fire through the hallways leading to the north corridor. The fire appeared to come down the hallways to the south corridor, and the south side of the building was also evacuated. One employee turned to a fire hose to fight the fire, but then realized the fire was too large to fight and ran from the building. Personnel in the trailer were alerted to the fire by the shouts of the people evacuating the building and by observation of the fire through the trailer windows, and evacuation of the trailer was started.

"A massive illuminant fire developed in the north side of the building and erupted from the north side before a heavy explosion. The development of this fire was accompanied by two dull conflagrations which were audible to people north of the building. After heavy fire erupted from the north side of the building, there was a heavy explosion which blew the building apart and knocked down most people within several hundred feet. A large brilliant fire ball accompanied or followed the explosion and witnesses reported 'fire was everywhere'. Burning candles and debris rained down over a wide area. A rain of burning candles was reported over a wide area, including the area near the Maintenance Shop, more than 500′ from M–132. The extreme flight of a burned candle was about 4200 feet.

"It is apparent from the location where the dead and the seriously injured were located after the explosion, that all personnel had evacuated Building M–132 prior to the explosion and that most of the people were a substantial distance from the building at that time."

(6)

## THE FACILITY: AFTER THE EXPLOSION

### THE THIOKOL INVESTIGATION

The explosion all but obliterated M–132. "Only the concrete cubicles in Building M–132 and some parts of the exterior wall which were shielded by the concrete bays of these cubicles remained standing. The other walls were sheared at floor level and broken into fragments. Fragments, candles, and structural roof members from the cure room were thrown considerable distances.... The rear wall of Bay 106 (12″

reinforced concrete); the bay nearest the cure room, was shattered and forced inward, and the rear of Bay 105, the companion bay to Bay 106, showed significant cracking. The building floor in the area of the cure room showed a large dished depression about 7″ deep and two smaller depressions. There was no evidence of any other explosion in the building."

There was damage to nearby structures. The east end of Building M–142 was collapsed. Building M–143 showed effects of the blast wave. Building M–131 which was 380 feet from M–132 was structurally damaged. About 30,000 flares in it were apparently ignited by burning candles thrown from M–132.

See Pl. Ex. 6, Thiokol Investigation Report, p. 20.

The physical damage was estimated at as high as $1,000,000. According to Dr. Joseph H. McLain, an expert witness for plaintiffs and an acknowledged authority in the field of pyrotechnics, "What happened was this material in the trays was ignited went from burning to explosion, in the time of milliseconds, and exploded in the particular confined room was enough and destroyed the building, created depressions in the floor, and demolished walls and threw projectiles." Testimony of Dr. McLain, p. 45.

Dr. Melvin Cook who is an expert of acknowledged repute in the field of explosives was employed by Thiokol to inspect the site and to give his opinion as to the cause of the explosion. He did not testify as a witness in the case. However, a statement by him at a meeting of the A.T. and F. investigators on February 23, 1971, is part of the record. Dr. Cook concluded that "the fire had originated at the first fire station, spreading to nearby containers of ignition pellets, which by their nature of ignition, flew down the corridor to a rack of granulated illuminant, causing it to ignite, and that this heat either ignited additional material in the corridor between 106 and 107 or through its own

heat, was sufficient to enter the oven at the end of the corridor. Dr. Cook stated that when this entrance was made, the amount of illuminant material was sufficient to explode, and that this material had reached a 'critical mass' state, and that it deflagrated at such speed, as to cause the destruction." See Pl. Ex. 101.

The Thiokol investigators stated in their report concerning the fire and explosion: "Examination of the depressions in the floor of the cure room show that the major force of the explosion was at the location of the trayed illuminant."[5]

The investigating team concluded that "the probable cause of the accident was the ignition of first fire powder by friction or impact caused by an operator at the first fire addition station on the ignition pellet line."

Post–explosion tests of the first material showed its high sensitivity to friction. It may be "ignited readily by the normal forces and velocities which may be exerted by an operator during handling of dies or striking two objects together." Thiokol Investigation Report, App., C–1.

Possible sources of ignition by friction included:

"1. Bumping or dropping a die, thereby igniting first fire contaminant in the die or on the follower plate.

2. Striking the scoop on a die.

3. Bumping a die against another die or other metal object, such as the conveyor frame, igniting first fire contaminant on the outside of the die or on the frame.

4. Sliding, bumping, or dropping a die on the board over the conveyor on which the dies were placed for loading, thereby igniting first fire material spilled on the board." Pl. Ex. 6, p. 3.

The operation at Woodbine was a "high risk" one. Deposition of Theron Driscoll,

5. The Government concedes as much. "[I]t's no big secret we know that there was material in the cure room that either exploded or caused

an explosion in the cure room." Statement of counsel during testimony of Dr. J. H. McLain, p. 42.

Office of Special Safety, Atlanta, p. 8. Dr. Joseph H. McLain testified as to the high sensitivity of the material in its loose state to friction and impact. There were five fires in Building M–132 prior to February 3, 1970. At least two occurred at the ejection station. According to McLain, where this type of illuminant is being handled there is "a finite probability" that you are going to have fires. He mentioned "human error, human frailty, people do drop things, and people do get misalignments in the pressing. . . ." McLain testimony, pp. 50–51.

The report by Thiokol was issued on July 30, 1971. See Pl. Ex. 6. The investigation team was composed of Thiokol personnel, two technical consultants and one investigative consultant. They were assisted by the Alcohol, Tobacco and Firearms Division of the United States Treasury Department and by the Safety Research Center of the United States Bureau of Mines. An ATF investigative report was separately made and filed. See Pl. Ex. 101. The Treasury Department also submitted its own report. Apparently, the Department of the Army declined to participate in the investigation.[6]

The Thiokol Investigating Team listed the following major contributing factors to the explosion. (Pl. Ex. 6, Report, p. 4):

"1. Inadequate hazard classification of the illuminant material.
    The hazard classification (Class 2 Fire Hazard) ascribed to the materials and the information relative to the hazards of the materials were inadequate to characterize the dangers in manufacturing operations. The explosion, not fire, was responsible for the severity of the accident.

2. Inadequate separation of materials.
    The relative locations of materials resulted in fusing through the building to the cure room.

3. Adequacy of the fire protection system.
    The inability of the fire protection system to contain the initial fire to a small area of the building probably resulted from the failure of the operators to pull the manual deluge valve as they exited the building and the slow response time of the automatic activation devices relative to the rate of spread of the fire."

The Report recommended that the government thoroughly evaluate, or fund contractors to evaluate, the hazards associated with pyrotechnic materials at all stages of processing and provide this information to all bidders on programs that require the processing or use of such materials.[7]

(7)

DOD SAFETY STANDARDS

The Contractors' Safety Manual (Pl. Ex. 2) is incorporated in the Thiokol contract by reference. The Contractor is required to comply with it. Contract Addendum; ASPR 7–104.79, Pl. Ex. 104. The purpose of the Manual was to prescribe "safe methods, practices, and standards for insuring continuity of production, safeguarding personnel. . . ." Para. 100. The Contracting Officer (PCO) and the Administrative Contracting Officer (ACO) had the responsibility of providing "safety clauses and technical safety data in contracts for ammunition, explosives and related dangerous materials". Those officials were also charged with seeking "counsel and advice of the cognizant DOD Component safety staff [Picatinny] to insure that safety criteria is included in the contract". Para. 103 a, b. The Manual (para. 701 c) provides: "For contractor owned contractor operated plants, it is the responsibility of the Procuring Contracting Officer to determine the

---

6. Under the trip flare contract, the United States in effect had the right to elect whether it would convene an investigative board. See deposition of Walter Glenn Queen, pp. 69–70, deposition of John P. Coffin, Manager of Safety, Thiokol, p. 25. The right to convene a board of investigation was questioned by Theron W. Driscoll of the Defense Contract Administration Service. Dep., pp. 61, 97. At any rate, there was a specific instruction not to conduct one. Dep., pp. 93–94.

7. The Report also recommended that cure rooms be located in a separate building. Report, pp. 4 and 5.

acceptable protection after considering the hazard involved and the risk that must be assumed."

The Contractor was under the duty of developing and implementing a safety program to assure the safety of its personnel, property and the general public with respect to the performance of work pursuant to the terms of the contract. Safety Manual, Para. 103 d(4). See also depositions of Herschel Q. Holley, pp. 80–82; Charles F. Otken, Jr., pp. 70–71. "The cardinal principle to be observed in any location or operation involving explosives, ammunition, severe fire hazards or toxic materials is to limit the exposure of minimum number of personnel, for a minimum time, to a minimum amount of the hazardous material consistent with safe and efficient operations." Para. 603 b(1). According to an ASPR Regulation (7–104.79, Pl. Ex. 104), no act or failure to act by the Government in surveillance or enforcement of the Manual "shall affect or relieve the Contractor of responsibility for the safety of his personnel and his property and for the safety of the general public. . . ."

However, both actually and contractually the Government prescribed basic safety standards and practices and saw to it that the contractor complied. In that respect as well as assurance of the quality of the end product the United States possessed and exercised the right to oversee the operation.

The Contractors' Safety Manual classifies the hazards of explosives and similar dangerous material. As noted earlier, the lowest rating is Class 2. It is a fire hazard only. It covers items that burn vigorously with little or no possibility of extinguishment in storage situation. Explosions of such material, according to the DOD Manual, normally will be confined to pressure ruptures of containers and will not produce shock waves or damaging blast overpressure.

Class 7 is the highest hazard classification. It covered Mass Detonating Hazards. The materials are defined as those that will explode virtually instantaneously when a small portion is subject to fire, severe concussion of impact, or impulse of an initiating agent. The explosion of items in Class 7 normally will cause severe structural damage to adjacent objects.

Clearly the degree of hazard under the Army's safety standards related to detonability of material rather than to danger from fire or deflagration of an item.[8] The standards established by the Manual were geared to the concept of the hazard by detonation as opposed to danger by fire.[9] The A.T. and F. officials who investigated

8. DOD Ammunition and Explosives Safety Standards (1969), Para. 3–12, Pl. Ex. 3:
   "2–16. Deflagration
   A rapid chemical reaction in which the output of heat is sufficient to enable the reaction to proceed and be accelerated without input of heat from another source. Deflagration is a surface phenomenon with the reaction products flowing away from the unreacted material along the surface at subsonic velocity. The effect of a true deflagration under confinement is an explosion. Confinement of the reaction increases pressure, rate of reaction and temperature, and many cause transition into a detonation.
   "2–17. Detonation
   A violent chemical reaction within a chemical compound or mechanical mixture evolving heat and pressures. A detonation, in contradistinction to deflagration, is the reaction which proceeds through the reacted material toward the unreacted material at a supersonic velocity. The result of the chemical reaction is exertion of extremely high pressures on the surrounding medium forming a propagating shock wave which is originally of supersonic velocity. A detonation, when the material is located on or near the surface of the ground, is normally characterized by a crater."

9. "Our obsession down through the years with the minutiae associated with the reaction we term a 'detonation' has so channelled our thinking and actions with regard to the hazards associated with the accidental ignition of energetic materials that we have improperly and inadequately characterized the true injury and death-dealing potentials of those hazardous materials with which we work." J. E. Settles, "Deficiencies in the Testing and Classification of Dangerous Materials", *Annals New York Academy of Science*, Vol. 1 (1968), p. 199. Pl. Ex. 47. However, I would not leave the impression that only the Government was imbued with that idea. As is reflected in the Settles paper, the detonation obsession was industry wide.

the Thiokol incident reported that "the production of the military trip flare presented a very distinct hazard to both personnel and property ... [T]he hazard of production was identified as that of fire, not explosion." Pl. Ex. 101. The safety regulations were largely oriented to that concept.

Whether a material was classified as Class 7 or as 2 depended on what is called the "card gap test". It is explained in Explosives Hazard Classification Procedures, 1967, Pl. Ex. 5 and in J. D. Settles, "Deficiencies in the Testing and Classification of Dangerous Materials", *supra*, (see footnote 9) pp. 201–202. See also testimony of Joseph H. McLain, pp. 22, 26. The test consists of placing the candidate material in a tube above (or below) a steel witness plate which bears "witness" to the detonative effect. The plate is ⅜th of an inch thick. The sample under test is ignited by a blasting cap at the top of the tube. Lucite cards are interposed in a gap between the booster and the material being tested. The witness plate rests on a wooden stand, 6 inches above the ground. "Detonation is indicated when a clean hole is cut in the witness plate." Then and then only is the material regarded as Class 7 under the definition. Since illuminants do not fulfill that requirement for detonation, they are a Class 2 fire hazard only.

The safety standards established by the Manual are "the Quantity–Distance" (Q–D) requirements. If Class 2 items weigh between 20,000 and 30,000 pounds, they should not be located less than 235 feet from "inhabited buildings", public railroads or highways. The distances prescribed in the instance of Class 7 items (Mass–Detonating Hazards) depends upon whether or not there were barricades. When such detonable materials weigh from 30,000 to 35,000 pounds, the distance requirement was 1,310 feet in the case of a barricade and 2,410 feet in the absence of one.

A strange thing about the Quantity–Distance standard as applied in the present case is that the employees working in M–132 were not in an "inhabited" building. They were working where the manufactur-

ing process took place which was the point from which the distance to "inhabited buildings" was to be measured. M–132 was an operational building; it was not "inhabited" so as to come within the distances prescribed in the Q–D tables. The nearest "inhabited" building was E–103 which was 1,420 feet from M–132. Deposition of Harry L. Padgett, Thiokol Safety Director, p. 53.

The Army's hazard precautions were seemingly not designed to protect employees of the contractor working in an operational building–the persons most endangered by an explosion during the manufacturing process. As the Government argued in its brief on the motion for summary judgment (p. 76):

"[T]he classifications are established for 'Q–D' measurements, or for establishing minimum distances between the explosives and other facilities and buildings. They do not apply *within* a building itself. Thus, the classifications were not relevant to the plaintiffs but only, at best, to workers in other buildings. Plaintiffs mistakenly assume a higher classification would have protected them when the building within which they worked was irrelevant to the classification scheme."

(8)

THE CLASSIFYING OF ILLUMINANTS

(A) The Government's contention that the trayed, untamped illuminants were properly Class 2 rather than Class 7 material requires it to argue that depressions in the concrete floor of the cure room (6 inches in depth at one point) were not craters. No crater, no detonation; no detonation, no Class 7 item, according to defendant.

It strikes this Court that we are allowing technicalities to obscure the real problem. The issue is not whether there was a detonation. It is whether the explosion in the cure room on February 3, 1971, and the resulting injuries and loss of life was proximately attributable to any negligence by the defendant.

According to Walter G. Queen, Chief of the Safety Office of the AMC, deflagration of illuminants under confinement may lead to an explosion. He testified that if enough heat is applied to the mix, rapidly enough and there is sufficient confinement, there is reason to believe that "you can get certainly a violent explosion. Perhaps not a detonation in the sense of TNT or some other materials but something that would look factually like this, in any event." Dep., pp. 38, 60. The General Manager of the Longhorn Division of Thiokol, Herschel Q. Holley, testified that Class 2 material (illuminants) would not themselves explode but vigorously burn and can produce an explosive-like rupture such as that of the cure room at Woodbine. Dep., pp. 271, 106.

The Safety Manual, 605b(4), in dealing with firefighting, notes that Class 2 ammunition may explode "if material is confined". The Government conceded at the trial that "there was material in the cure room that either exploded or caused an explosion in the cure room". Government counsel's statement reported in the testimony of Dr. McLain at p. 42. It is admitted by defendant that there is a risk of explosion from Class 2 materials. Brief on Government's motion for summary judgment, p. 26.

Theron Driscoll, Safety Engineer of DCASR at Atlanta, was aware, prior to 1971, that flash fires involving pyrotechnic materials had resulted in explosions. He was also cognizant that under conditions of confinement Class 2 illuminants could explode. Dep., pp. 85–86; 123, 132. The record in this case includes several reports as to such incidents that were made to the appropriate Army command between 1954 and 1967. See Pl. Exhibits 84 through 88.

(B) Prior to November 3, 1967, loose illuminants in process were classified as Class 7

items.[10] However, the following year certain illuminants were downgraded to Class 2. In 1970 the Thiokol (Woodbine) flares were *not* classified or treated as Class 7 items by contract or otherwise. An "Alert" which is part of the contract deals with "Transportation of Explosives" and classifies the material as Class 2. However, for the purpose of the Quantity–Distance requirements the material is designated as Class 2 and the contracting parties treated it as such. At the time of the explosion on February 3, 1971, illuminants were classified as Class 2, according to the Procurement Contract Officer at Picatinny. The ascending scale of classification used by the Army indicates the dangers or safety factors involved. Holley dep., pp. 68–69, 117.[11]

This Court cannot agree with the contention of the Chief of the Munitions Engineering Division at Picatinny that Thiokol and other contracting manufacturers make the classification of illuminants. Deposition of Seymour Fleishnick, pp. 25, 30–33, 41, 44–45, 48. Even less do I agree with the Government's argument that the Hazardous Item Contracts regulation of April 15, 1969 prohibits the Procuring Contracting Officer from specifying hazard classifications except in respect to the *end item* or product. AMC Regulation 385–17, Para. 5c.(1)(d), Gov't. Ex. 80. The contention is based on the responsibility assigned to AMC and the Procuring Contracting Officer in the matter of "Specification of hazard classifications of end items and pertinent safety standards in contract solicitations and contract documents." That the Regulation did not withdraw the authority of AMC in respect to classifying in–process materials is amply evidenced by the conduct of the Army.

Reference was made on page 20 to the sensitivity of loose illuminant compositions

10. Deposition of Walter G. Queen, pp. 25–28. An exception was made in the case of a Mark 24 illuminating item. It was classified by the Army as Class 2 material. See Otken dep., p. 121.

11. But it is not necessarily true that the higher the class the greater is the degree of caution to

be taken in production and manufacture, according to W. G. Queen, Chief Safety Officer, Army Material Command. "A Class 2 item might in fact be as hazardous to the nearby involved individuals as Class 7," he testified. Queen dep., pp. 41–42.

and their susceptibility to ignition by friction or impact. Evidently that is what occurred at Woodbine and it was not the first time. In the weeks prior to February 3, 1971 five minor fires occurred in Building M–132. Two of them took place at the first fire addition station where the fire on February 3, 1971 originated. At least two of these incidents were reported to Picatinny, one by telephone on January 4, 1971, and another by letter on January 20, 1971.

The Thiokol Safety Board met on January 8, 1971. Its subsequent report listed as the cause several unsafe practices. Officials at Picatinny were aware of the frequence in the industry of small fires in processing of illuminant materials. Otken dep., pp. 63–64. See also Gov't. Ex. 84 which reports tests following a fire on an illuminant production line at the Navy's Ammunition Depot at Crane, Indiana on January 4, 1968. The Navy's tests looked to better methods of putting out such fires rather than preventing them.

(9)

DISSIDENT VOICES

(A) Among the witnesses at the trial was Dr. Joseph H. McLain who appeared as an expert on behalf of the plaintiffs. He is President of Washington College at Chestertown, Maryland. Dr. McLain received his doctorate in chemistry and has had wide experience in the manufacture of pyrotechnics and explosives. During World War II he was stationed for a time at Edgewood Arsenal in Maryland in the capacity of Chief of the Smoke Branch, pyrotechnic division. After the war, Dr. McLain was a consultant at Edgewood. He has engaged in the business of manufacturing illuminants.

In the summer of 1968 and for several years thereafter he conducted a week–long seminar at the Franklin Institute in Philadelphia. It was attended by personnel of various Government agencies, including high ranking military officers. McLain strongly opposed the idea prevailing in high circles that pyrotechnics will not per se explode. It had become with him, he said, "almost a labor of love, evangelical zeal ...

to try to eradicate this superstitious belief that these things will not detonate". Testimony, p. 20. In his lecture on safety at Franklin Institute he took particular exception to the classification given such pyrotechnics by the Army in its technical bulletin, TB 700–2. He thought such materials should have a classification of their own on the basis of output and sensitivity. Testimony of McLain, p. 54. "I would like to propose that pyrotechnics be given a position of their own, separate and distinct from explosives ... based upon definitive testing and experience, and just as there are class A, B, and C explosives there should be some similar classification for pyrotechnics." McLain, "Pyrotechnics and Solid State Chemistry", 17–1 (1973), Pl. Ex. 50.

Dr. McLain is particularly critical of the military's test for determining whether a substance is an explosive or detonable. The card gap test "miserably" fails, he said, "to establish a hazard classification." Testimony, p. 26. In the lectures referred to he discussed the question:

"What is the nature of protection that must be given to personnel? Should it protect against shock wave, over pressure and sympathetic detonation between buildings in the case of a detonable material, or should it protect against fragmentations, radiant heat, smoke inhalation and/or suffocation as is the case with most pyrotechnics?"

According to Dr. McLain, "A medium to high rate explosion which can occur from a pyrotechnic mix kills and damages with fire ball and fragments. Barricades unless of proper height and design only serve to increase the distance of throw of fragments and burning debris." In summarizing, he said: "[E]xplosives and pyrotechnics differ widely in methods of protection, characteristics of output and initiation. Industry and Government must realize these basic differences and take action to make a more realistic code for the protection of life and property." Pl. Ex. 50.

(B) J. E. Settles was Manager of Safety, Chemical Propulsion Division of Hercules,

Inc. at Wilmington, Delaware. Reference has been made above to his paper (published in 1968) entitled "Deficiencies in the Testing and Classification of Dangerous Materials". Pl. Ex. 47.[12] His views correspond with those of Dr. McLain as to the inadequacy of the "card gap test".[13] They are in accord as to the defects of the DOD classification system as applied to illuminants based on the detonation theory and fully agree concerning the danger of explosion of Class 2 items. In his article Mr. Settles attacked "the general acceptance of the philosophy that all reactions other than the high–velocity detonation are fire hazards only." Analyzing 81 accidents that had occurred in the munitions industry since 1959, he reached the conclusion that of 78 fatalities all but one resulted from non-detonating forces. Mr. Settles found serious inconsistency in accepting a "fire hazard only" in respect to reactions of such violence and destructive energy as high-rate, medium–rate and low–rate "explosions". In his opinion, a "searching reappraisal of past and present practices" was needed in the industry.

(10)

THE 1968 THIOKOL (WASATCH) TESTS

Illuminant hazard tests were conducted in 1968 by the Wasatch Division of Thiokol at the Army Air Force installation at Brigham City, Utah. The purpose was to determine what results could be expected should Thiolite B–7 ignite during any of the various stages of illuminant processing.[14] See Pl. Ex. 10 and 11. The tests which were filmed in color are in evidence as Pl. Ex. 12 and 13. The films were shown at the trial. This Court has looked at them again. They dramatically illustrate the conclusion in Thiokol's Wasatch Report (Pl. Ex. 11, p. 3):

"B–7 illuminant in the untamped, unsecured condition when ignited would explode violently. In open containers the material, whether ignited on the surface or below the surface, would instantly cast the burning mass up out of the container from which point the mass would further explode in all directions."

It was further determined that the ignition of untamped illuminant produced a definite shock wave of undefined magnitude as the result of the rapid deflagration or a true detonation.

Among the conclusions reached as a result of the tests were the following:

"An ignition of untamped illuminant results in an extremely rapid deflagration that produces a shock wave of devastating proportions."

"A large quantity of untamped, uncured B–7 illuminant in a container, surface ignited, will begin to burn rapidly in approximately ¾ seconds. The rate of the flame front growth will then become extreme and a shock wave will result."

The recommendations following the tests stated in part:

"It is recommended that the frangible roof concept be utilized for facilities in which large quantities of untamped illuminant will be processed."

"Exposure of personnel to untamped illuminant should be kept to an absolute minimum. Operations should be accomplished remotely to the greatest extent practicable."

12. The symposium at which this paper was read was organized by a Picatinny official. Fleishnick dep., pp. 109–110. For comments by Mr. Fleishnick on the Settles article see "Some Recent Approaches in Hazards Classification presented at at DOD Explosives Safety Seminar in 1973". Def. Ex. 38.

13. The Government witness, Mr. Queen, conceded that the "card gap test" was inadequate in testing loose illuminants (it was "never intended to do so") for hazard classification. Dep., pp. 35–36. A Government safety expert, Theron Driscoll, admitted that Technical Bulletin 700–2 does not provide a valid test for the explosive hazard of illuminants. Dep., 128. The defendant's brief on the motion for summary judgment stated that the fact that the card gap test is "a poor measure of the detonability of non–detonable materials is known throughout the industry." Dep., p. 72.

14. The B–7 illuminant was composed of approximately sixty percent magnesium thirty-five percent sodium nitrate with a ten percent combination of binder curative.

"Extreme precautions must be taken in process and facilities design to prevent an incident."

"Facilities and equipment should be designed as though any incident involving personnel in the area not protected by properly designed barricades will be fatal."

There is no evidence that the Thiokol reports were made known to the Air Force but it was apparently aware of certain changes that were implemented by the tests. Dep. of William L. Childress, p. 73; and his supplementary letter of March 11, 1974. See Pl. Ex. 15.

## (11)
### THE ROLFE REPORT, BRITISH MINISTRY OF DEFENSE

In 1969 or about that period the British Ministry of Defense in order "to assist safety considerations allied to processing and storage", conducted experiments relating to the explosive effects of a variety of pyrotechnic compositions. See P. J. Rolfe, "The explosive effects of pyrotechnic compositions: Assessment of mass explosion hazards from some pyrotechnic compositions." Royal Armament Research and Development Establishment Memorandum 57/69 (December, 1969), Pl. Ex. 35. The tests included flare compositions of which magnesium and sodium nitrate were constituents. Ignition occurred in less than 200 milliseconds and the materials were consumed in 1 or 2 seconds. Deflagration resulted in considerable gaseous residues. The Rolfe Report concluded that the product explodes in confinement even in the instance of one pound in a cartridge.[15] For a summary of the Report see Dr. McLain's testimony, p. 219.

## (12)
### CLASS 2 UPGRADED AS TO VARIOUS PYROTECHNIC COMPOSITIONS

It is clear from the above that leaven was at work in 1968–1970 in the reevaluation of hazards and classification of illuminant compositions. It is less clear to what extent these developments and the researches in pyrotechnics influenced Picatinny in that period. At any rate, in November, 1970 illuminant material was reclassified and became a Class 7 item. Prior thereto, tests had been conducted by AMC personnel at Picatinny Arsenal and by General Electric Company at the NASA facility in Mississippi on the subject of hazard classification and evaluation of selected pyrotechnic compositions. In October, 1970 there went up through channels to the Commanding General, U.S. Army Materiel Command, from Munitions Command a report and recommendations dated October 29, 1970. Pl. Ex. 43A. The communication stated in part:

"8. It is recommended that pyrotechnic compositions no longer be tested in accordance with the procedures given in Army Bulletin TB 700–2, Chapter 3. It is further recommended that an interim hazard classification of Class 7 be assigned to loose pyrotechnic compositions during handling, storage and transportation, until more meaningful tests can be adopted.

"9. Picatinny Arsenal in its hazard classification program is developing a series of tests which will determine the deflagration to detonation characteristics of pyrotechnic compositions. These tests include rates of detonation, confined ignition temperature and pressure–time behavior under heavy confinement. Those compositions which appear to detonate, low to high order, will be tested for TNT equivalency for potential damage assessment. It is believed that the data obtained from these tests will give more meaningful criteria for hazard classification of pyrotechnics."

Accompanying the report was a communication to the General from Walter G. Queen, Chief Research & Labs, Safety Officer. It stated: "Pending completion of the Picatinny Arsenal program for development

15. A copy of the Rolfe report was in the library at Picatinny. Mr. Seymour Fleishnick was asked, "Do the indications in the Rolfe report of very rapid deflagrations of illuminant compositions indicate that it would be an area of concern with reference to the hazard classification thereof?" He replied, "Not in my estimation." Dep., pp. 106–107.

tests to determine the hazard classification of pyrotechnic compositions, loose pyrotechnic compositions should be considered hazard class 7." Mr. Queen testified that it had been agreed that they should "take a second look to see if Class 2 really did define this well". While the evidence was not conclusive in connection with the pyrotechnic classification procedures, to be on the conservative side, "we did agree with them that we should, in fact, retract our classification that was established, I believe, in '68 and we so advised MUCOM." Queen dep., p. 32.

It appears that on November 16, 1970, AMC approved the recommendation to upgrade illuminants to Class 7. At this point something went skew in army bureaucratic circles. For some reason the approval was not disseminated. It was not until March 25, 1971, *after the explosion*, that Thiokol was notified of the action taken by AMC in February that all pyrotechnic compositions, in storage or process, "must be considered as Explosive Hazard Class 7, even though they have been tested here and determined by TB 700-2 to be Class 2 explosive materials." Pl. Ex. 15. One month before, on February 25, 1971, the commanding officer at Picatinny had informed the General Manager of the Georgia Division of Thiokol: "As a precautionary measure, and until such time as further evaluations or new test criteria are established, it is recommended that the unconsolidated magnesium-sodium nitrate illuminant composition be reclassified back as Class 7 material." Pl. Ex. 30.

The Government says that this was not an order, only a recommendation, a fact exemplifying the lack of control of the United States over the matter. Brief on motion for summary judgment, p. 73. Defendant argues that it had no responsibility to disseminate the classification change. It says that it was without authority under the Thiokol contract to fix an in-process classification and that the Company had control over the classification, not the United States. See defendant's brief on motion for summary judgment, pp. 73, 76. Mr. Fleishnick testified in answer to the question whether or not Picatinny classified the

illuminant and designated such classification, as follows: "We did not ... the company does that based on their background and their experience.... They make that classification based on the information that they have in many documents relating to pyrotechnics." Dep., pp. 30, 41–42, 44.

I cannot agree. The Government witness Queen testified that it is the function of the Army Materiel Command to make hazard classifications of potentially dangerous munitions, pyrotechnics and explosives. Dep., pp. 17, 26. Mr. Queen stated that the general effect of the decision made in November, 1970, to up-grade illuminants was to return to the Class 7 designation that prevailed in 1967. Dep., pp. 34–35. The Safety Engineer DCASR–Atlanta testified that the new Class 7 designation existed by virtue of the authority of Picatinny Arsenal "because they have authority to put a classification on the material". Driscoll dep., p. 106. It is clear that the Government, not the contractor, prescribed classifications of hazardous material. The Army not only possessed but it exercised that authority.

(13)

FAILURE TO NOTIFY THIOKOL OF THE DECISION TO UPGRADE DECISION

Thiokol was not notified of AMC's decision to upgrade illuminant material to Class 7 until after the explosion. According to the Chief Safety Officer at Picatinny, it was ordinarily expectable that all operating levels, whether military or private, would have been advised of that decision. Dep., p. 35. Neither Thiokol nor DCASR–Atlanta was notified. The normal procedure would have been to send it "directly to Thiokol–Woodbine with a copy to DCASR–just to alert them". Otken dep., p. 87.

It is not clear what happened after the upgrading directive of November 16, 1970. It was forwarded to the Pyrotechnic laboratory at the Picatinny Arsenal but Mr. Fleishnick was unable to trace it from there. Dep., pp. 77–78, 98–99. There is a suggestion in the record that it went to an official, Gary Weingarten. Apparently the

document was found in his desk after the disaster. Mr. Weingarten was then residing in Tel Aviv and his testimony was not available.

The question immediately raises itself: What difference did the lack of notice make? Put differently, what causal connection existed between the explosion and the failure of AMC and of NUCOM not to notify Thiokol that in–process illuminant compositions had been upgraded to Class 7?

It made a big difference, according to a Thiokol executive. Joseph B. Galloway, General Manager at Woodbine, testified that if the letter of February 25, 1971, recommending a Class 7 handling of in–process illuminants had been received, "we would have reacted to change our process to comply with it." It would have been considered a "mandate". Galloway added that "We did take action to go that way on the 81 Millimeter" [illumination cartridge]. Dep., pp. 50, 233. He further testified that if the November, 1970, directive had been made known to Thiokol, the operation in Building M–132 would have been closed "until correction could have been made to comply with such classification". Dep., p. 110. In answer to a question put to him, Mr. Galloway expressed the opinion (p. 111):

"If we had had a change in classification to Class 7, I would have not have had the Cure Room there and the material–we had knowledge–we had checked enough into other people's information that we felt very strongly that it would not explode if it was stored properly on those trays, nor would it explode once it had been consolidated. If we had had knowledge that we needed to change it to Class 7, we would have had to move the Cure Room.[16] We would have to take the operation as labeled in being in bays 103 and 104 and made them a remotely controlled operation and the total amount of material in the building would have to have been drastically reduced."

Mr. Galloway was the same official who informed the Contracting Officer at Picatinny on February 1, 1971, that Thiokol would incur losses on the contract estimated at in excess of a million dollars and that an increase of additional orders of flares, pursuant to the Army's option would "generate a serious conflict in the usage of our illuminant mixing and consolidation building for the 81 MM illuminating cartridge...." Gov't. Ex. 6. To comply with a Class 7 designation would have required a letter to Thiokol "with the proposed change, and then allowed them to respond as to what effect it would have on cost or delivery," according to Mr. Otken.[17] He testified that "if we had been told by the safety people to put it in the contract, we would have negotiated a change in the contract with the contractor". Dep., pp. 82, 87.

Defendant contends that there is no proof that Thiokol would have accepted any reclassification of the material. The Government points out that in 1967 the Longhorn Division of Thiokol persuaded the Army, following card gap tests, to downgrade certain illuminant materials from Class 7 to Class 2. See deposition of Padgett, p. 55; Holley, pp. 113, 230–233, 238–239; Queen, pp. 70–71. In the November 3, 1967 letter from the Longhorn military authorities authorizing down–classing of the material it was requested that the mixing of illuminant composition of the items continued to be

**16.** The Thiokol Safety Director at Woodbine described Class 2 protection as involving the "shielding" of operators whereas Class 7 would call for "a remote controlled operation". Deposition of Harry L. Padgett, p. 33.

**17.** In Dr. McLain's testimony he described an incident in 1968. A burning type composition for use in grenades had been contracted with a low bidder and the Army wanted to change the classification to Class 7. Dr. McLain informed the military authorities who called on him in his consultant capacity that if they categorized it as Class 7 the manufacturer would demur because the bid had been made on the basis of the existing physical facilities. "Well, they said well, have you tested it for class 7, and I said yes. And, I said well, did it blow a hole through the witness plate, no. Then how can you define it as class 7. Well, they admitted that they couldn't, and that the contractor would have a very reasonable relief against them." Testimony, p. 30.

treated as Class 7.[18] Thiokol's General Manager at Longhorn wrote a note on the Army's authorization: "Treat as Class 7 but do not list as Class 7 on SOP [Standard Operating Procedure]. Show it Class 2 for QD. purposes." Gov't. Ex. 3.

(14)

## CONTENTIONS OF PARTIES

### (A) Plaintiffs' Contentions

Plaintiffs' claims of negligence by the United States are thirty in number. They embrace a wide spectrum of allegations. The categories include the impropriety of the classification of materials; failure to warn as to hazards involved; design of cure room and lack of frangible walls; approving Thiokol's practices after safety surveys; inadequate staffing of Army Procurement Supply Agency and lack of correlation of safety matters; lack of barricades surrounding Building M-132 (this claim was abandoned by plaintiffs at the trial, see McLain testimony, p. 135); in not defaulting Thiokol on contract, and in the failure to require and supervise evacuation procedures and train plaintiffs in same.

Plaintiffs' numerous allegations of negligence refine themselves into the following basic claims:

1. In down-classifying illuminants from Hazard Class 7 to Class 2 based on an incorrect standard set out and relied on in Technical Bulletin 700-2 which establishes a "card gap test" in determining detonability of materials used in manufacturing trip flares.

2. In failing to communicate to Thiokol or to plaintiffs the decision it made in the fall of 1970 to upgrade illuminants from Class 2 to Class 7.

3. In the failure of both Army Materiel Command (AMC) and Munitions Command (MUCOM) to follow up on its November 16, 1970 order so as to assure that notification was, in fact, given to Thiokol and to the concerned personnel so as to secure compliance therewith.

4. In the failure of AMC, MUCOM and Picatinny Arsenal to use all means to communicate and disseminate prior to February 3, 1971, its November, 1970 decision upgrading loose illuminants to Class 7.

5. In failing to share with plaintiffs the knowledge and expertise it had, as indicated in paragraph 2-16, page 2-2, of Department of Defense Manual 4145.27M to the effect that a true deflagration under confinement results in an explosion.

6. In failing to properly classify loose, in-process illuminants.

(The foregoing resume of the contentions of plaintiffs are adopted from their post-trial brief).

### (B) Defendant's

The Government's major contentions are as follows:

1. The United States is not liable under Georgia law for injury to employees of an independent contractor for alleged independent negligence of the Government in failing to transmit to the contractor an upward revision of a hazard classification.

2. The United States is not liable for injury to employees of an independent contractor where it allegedly has knowledge of a dangerous condition and does not direct or see to it that same is corrected.

3. The United States is not liable for injury to employees of an independent contractor where the Government allegedly controls the safety aspects of the production of a hazardous item.

4. The United States is not liable to plaintiffs in view of the exception in the Federal Tort Claims Act in respect to the exercise or performance by a Government agency of a discretionary function. 28 U.S.C. § 2680(a).

5. The breaches of contract by Thiokol and its careless housekeeping practices in respect to Building M-132 was the proximate cause of the explosion.

In considering the issues as so framed by the parties a review of the statutes and the case law is in order at this point.

---

**18.** At Thiokol (Woodbine) the *mixing* of illuminant compositions was a Class 7 hazard.

285

(15)
### THE LAW: A CONSPECTUS

The governing law in actions against the United States under the Federal Tort Claims Act is that "of the place where the act or omission occurred". 28 U.S.C. § 1346(b). Here Georgia law controls. *United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805.

Counsel for the parties have paraded before this Court a legion of authorities which they discuss, analyze, distinguish and, according to whether the case helps or hurts, commend or contemn. There is no room in this opinion, already 40 pages long, for a case by case analysis of the decisions by this Court. I confine myself in this discussion to identifying the principal legal issues (and in two or three instances resolving those in dispute) bearing upon the ultimate decision as to defendant's liability in this case.

*(a) Thiokol's Status as an Independent Contractor and the Legal Consequences thereof in this Case*

There can be no doubt that Thiokol's legal status was that of an independent contractor under its contract to manufacture trip flares for the Army. Counsel for plaintiffs concede as much. That fact being established, the United States contends that it is not liable to the employees of the independent contractor under the law of Georgia as codified in Ga.Code Ann. § 105–502.

That section provides that the employer (*viz.* the party contracting with an independent contractor) is not liable for the latter's negligence except under certain circumstances. Those exceptions are:

1. "When the work is wrongful in itself, or, if done in the ordinary manner, would result in a nuisance."

2. "If, according to previous knowledge and experience, the work to be done is in its nature dangerous to others, however carefully performed."

3. "If the wrongful act is the violation of a duty imposed by express contract upon the employer."

4. "If the wrongful act is the violation of a duty imposed by statute."

5. "If the employer retains the right to direct or control the time and manner of executing the work; or interferes and assumes control, so as to create the relation of master and servant, or so that an injury results which is traceable to his interference."

However, the theory behind plaintiffs' case is that while the contractor (Thiokol) was at fault the Government was itself guilty of independent negligence proximately contributing to the injuries. In other words, the United States and Thiokol were joint tortfeasors. Of course, Thiokol cannot be and is not sued as a joint tortfeasor because of the exclusivity provision of the Workmen's Compensation Act. But its immunity from a tort action by an injured employee does not affect the liability of the United States for independent acts of negligence. The Georgia Workmen's Compensation Act recognizes this. It expressly preserves a right of action by an employee "against any third–party tortfeasor". Ga.Code Ann. § 114–103; *Echols v. Chattooga Mercantile Company*, 74 Ga.App. 18, 24–25, 38 S.E.2d 675; *Williams Bros. Lumber Co. v. Meisel*, 85 Ga.App. 72, 75, 68 S.E.2d 384; *Georgia Power Company v. Diamond et al.*, 130 Ga.App. 268, 269, 202 S.E.2d 704; *Sims et al. v. American Casualty Company et al.*, 131 Ga.App. 461, 468, 206 S.E.2d 121.[19] "On general principles it is

19. In spite of this array of authority the Government urges that no Georgia case permits a servant of an independent contractor to sue the employer. See post–trial brief, pp. 39–40. This mistaken notion is probably contributed to by the fact that plaintiffs relied largely on *Johnson v. Western & Atlantic Railroad Company*, 4 Ga.App. 131, 60 S.E. 1023 for the proposition that the "employer may become liable for injuries sustained by a servant of the independent contractor, *either on account of*

*his own wrongful act* or by interfering and assuming control, so that an injury results which is traceable to his interference." (italics supplied). The language in question which appears in a headnote is dictum. The opinion itself shows no such basis of liability to the injured employee of the contractor. Attention is called, however, to the fact that at that time headnotes were prepared by the judges of the appellate courts of this State.

clear that the employer may be held liable, as a joint wrongdoer, if his own misconduct cooperated with that of the contractor in producing the injury complained of." 30 A.L.R. 1508.

■ Under Georgia law one of several joint tortfeasors may be sued. The plaintiff "can pick out whomever he pleases to sue who is liable.... He has his choice." *Wilson v. Ray*, 64 Ga.App. 540, 543, 13 S.E.2d 848. There may be a recovery against either or both of the responsible parties where their separate and independent acts concur to produce a single injury, despite the fact that the injury may not have happened had only one of the acts of negligence occurred, and despite the fact that the duty owed by each defendant may not be the same. *McBerry et al. v. Ivie*, 116 Ga.App. 808, 812, 159 S.E.2d 108. "Where one is injured by the concurring negligence of two tortfeasors, each is liable for the whole injury although the other defendant may have contributed thereto in greater degree." *Isom v. Schettino*, 129 Ga.App. 73, 76, 199 S.E.2d 89, 93. Even where the negligence of one tortfeasor is only 3% and that of the other is 97%, the former is jointly and severally liable under Georgia law for the entire verdict. *Gates v. L. G. DeWitt, Inc.*, 528 F.2d 405, 413 (5th Cir.).

### (b) The Discretionary Function Exception

■ The Federal Tort Claims Act is inapplicable to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

In the leading case of *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (the Texas City Case) the Supreme Court decided that a claim fell within the "discretionary function" exemption of the Act where the damages sued for resulted from a disastrous explosion of ammonium nitrate fertilizer aboard a freighter. The plaintiffs charged that the United States was negligent, *inter alia*, in its conception of the fertilizer export program under which the product was being shipped; shipping the product with knowledge that combinations of ammonium nitrate might explode under certain conditions, and failing to give warning of that possibility.

A majority of the Supreme Court held that the Government's high level decision to export fertilizer after World War II was a discretionary act at the planning rather than "operational" level and that experimentation by the United States to determine the combustibility of the substance was likewise discretionary. The reservation of sovereign immunity under the Tort Claims Act, said the Court, includes the initiation of programs and activities as well as determinations by federal executives or administrators in establishing plans and specifications and the acts of subordinates in carrying out the operations of the Government in accordance with official directions constitute no basis for recovery. 346 U.S. at 30–38, 73 S.Ct. at 965–969.

Since that decision, the Supreme Court ruled in *Laird, Secretary of Defense v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 that damage from a sonic boom caused by a military plane is not recoverable where no negligence was shown either in the planning or operation of the flight. The Court reaffirmed its holding in *Dalehite* that the Tort Claims Act does not authorize suit against the Government on the theory of strict or absolute liability where ultrahazardous activity is involved. "The legislative history discussed in *Dalehite* indicates that Congress intended to permit liability essentially based on the intentionally wrongful or careless conduct of Government employees, for which the Government was to be made liable according to state law under the doctrine of *respondeat superior*, but to exclude liability based solely on the ultrahazardous nature of an activity under-

taken by the Government." P. 801. See Garrett, "Torts–A Definite Pronouncement on the Federal Tort Claims Act–Strict Liability Eliminated," 9 *Georgia State Bar Journal* 342 (1973).

An inroad on *Dalehite* was made in *Indian Towing Co., Inc. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48. The case involved damage to a vessel that went aground because a lighthouse operated by the Coast Guard was not functioning. The Supreme Court said (p. 69, 76 S.Ct. pp. 126–127):

> "The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Torts Claims Act."

See also *Rayonier, Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354.

In *United States v. Page*, 350 F.2d 28 (10th Cir.), cert. den. 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470 it was held that the Government was not liable for the death of an employee of an independent contractor because it undertook to administer a safety program where the safety of the contractor's employees was under the exclusive control and supervision of the contractor. The latter had the responsibility to perform and supervise individual functions of its employees and the safety program established by the Government did not constitute any such control. The Court said that the fact that the activity was dangerous was not material. That decision was followed by the 10th Circuit in *Eutsler v. United States*, 376 F.2d 634. It was said that the Government neither expressly nor impliedly contracted to control the work of the inde-

pendent contractor's employees and was not liable for the death of one of the latter's employees on the theory that having undertaken to impose certain safety precautions in some areas violated a legal duty by not imposing similar precautions in similar cases.

Applying California law, a result inconsistent with the Seventh Circuit cases was reached in *United States v. Babbs*, 483 F.2d 308 where the Ninth Circuit said:

> "Both *Page* and *Eutsler* stand for the proposition that a plaintiff may not recover under the Tort Claims Act solely because his employer was under contract with the United States. This does not affect the present action, however, for there is no attempt by Babbs to base the Government's liability merely upon the relationship between the parties. While this relationship would not be enough by itself to support Babbs' claims, it certainly does not preclude his recovery, as the Government appears to suggest, providing he can show that the Government was negligent, and that the activity engaged in was 'intrinsically dangerous'."

In affirming a judgment for plaintiff against the United States the Ninth Circuit said:

> "The Arsenal had promulgated a document (Para. 2807) dealing with the use of ovens for heating explosive and flammable materials which related directly to the work being performed by Babbs. Had he been provided with this information, the specific dangers involved in oven–drying the cartridge cases would have been apparent. Yet despite the Arsenal's recognition of the need for a document setting forth standards of oven design, installation and use to one in precisely the position of appellee, this information was not passed on to him. The Arsenal also neglected to furnish Babbs with a copy of PAPD 2616 containing paragraph 6.8, which prohibited the heating of the cartridge cases at a temperature above 105° F. Under these circumstances, we have no reservations in affirming the trial court's judgment that the Government

was negligent in failing to provide Babbs with these documents and that this negligence was the proximate cause of his injuries."

The decision of the Fifth Circuit in *Smith v. United States*, 497 F.2d 500 involved injury to an employee of a subcontractor engaged in constructing a levee under contract with the Department of the Interior. It resulted from a premature detonation caused by an inadequate handsignaling system devised by a Government employee in connection with warning of blasting operations. The Court affirmed the finding by the trial court that the signaling procedure was negligently devised by the United States inspector who had knowledge of the method of signaling actually used and the dangers incident thereto and had the power to rectify same but did not do so.

Among the district judge's conclusions of law was the following:

"The giving of instructions regarding blasting procedure was not a discretionary function but was one on the operational level. The United States is not liable for inspecting the work, but it is liable for negligent direction thereof. When the United States merely observes and is guilty of omission or inaction, it cannot be liable. When it affirmatively acts and instructs negligently, as it did herein, it is liable."

In agreeing with this conclusion of the trial court the Fifth Circuit said:

"The government correctly states that it cannot be found liable simply because it had knowledge of a dangerous procedure yet failed to rectify it, and the district court said as much in its Conclusion of Law No. 7. But it is equally true that if [the Government inspector] did devise and instruct with respect to the concededly dangerous procedure, the government

is responsible for such an affirmative act of negligence." [20]

### (c) Liability of Employers Contracting with Independent Contractors for Inherently Dangerous Work

■ In Division 14(a) of this Opinion the relationship between Thiokol and the United States was identified as that of independent contractor and employer. Retaining the right under the contract to inspect the work; issuance of regulations and a manual relating to a safety program; having a safety inspector on the job, and failing to stop the work do not in themselves create liability by the Government to an employee of the independent contractor. *Market Insurance Co. v. United States*, 415 F.2d 459 (5th Cir.); *Toppi v. United States*, 327 F.Supp. 1277, 1279 (E.D., Pa.); *Fisher v. United States*, 441 F.2d 1288 (3rd Cir.); *Roberson v. United States*, 382 F.2d 714 (9th Cir.). The Government's superior knowledge of safety standards increases its duty of exercising ordinary care, it was said in *Gowdy v. United States*, 412 F.2d 525, 534 (6th Cir.).

■ However, this Court rejects the idea that the United States did not possess or exercise general control and direction of safety standards and precautions. See Division 7 hereof. The theory that Thiokol alone was responsible for establishing such requirements is belied by the contract, by decisional law and the conduct of the parties. The fact that both the Government and Thiokol had responsibilities as to safety standards or that the contractor possessed or had equal means of knowing a serious hazard was involved does not insulate the United States from liability for its own negligence.

This Court likewise rejects the contention by the United States that it could or did

---

**20.** Fifth Circuit cases which relate to the discretionary exception or involve the matter of governmental responsibility under contracts with independent contractors include: *Market Insurance Company v. United States, supra,* 415 F.2d 459; *Moyer v. Martin Marietta Corp.,* 481 F.2d 585; *Chanon v. United States,* 480 F.2d 1227; *Seaboard Coast Line Railroad v.*

*United States,* 473 F.2d 714; *Pigott v. United States,* 451 F.2d 574; *Bartie v. United States,* 326 F.2d 754 (cert. den., 379 U.S. 852, 85 S.Ct. 98, 13 L.Ed.2d 55; *H. L. Properties, Inc. v. Aerojet–General Corp.,* 468 F.2d 1397; *Ramirez v. United States Department of Interior–Bureau of Reclamation,* 546 F.2d 645, cert. applied for, 45 LW 3798.

contractually divorce itself from any liability for its negligence in relation to the employees of Thiokol was entirely delegated to the independent contractor. The Government cannot deal Thiokol's employees out by making a rule that their safety was the sole responsibility of the contractor. While the retention and exercise by the employer of the right to inspect the operations of the contractor does not by itself constitute a basis of the liability by the Government for injuries to employees of the contractor, the latter's inspections and activities in respect to standards and practices went beyond assuring itself of the quality of the end product.

The rule in Georgia is that in the case of dangerous instrumentalities the defendant's duty is one of ordinary and not extraordinary care. *Hand v. Harrison*, 99 Ga.App. 429, 108 S.E.2d 814; *Lemming v. J. P. Roberts & Sons, Inc.*, 130 Ga.App. 564, 569, 203 S.E.2d 898. However, "ordinary care as to a thing which is subtle, violent and dangerous ... may require a greater degree of caution than does an agency which lacks these dangerous propensities." *Womack v. Central Georgia Gas Company*, 85 Ga.App. 799, 803, 70 S.E.2d 398, 403; *Reddick v. White Consolidated Industries, Inc.*, 295 F.Supp. 243, 245 (S.D., Ga.). *Cf. Parrott v. United States*, 181 F.Supp. 425, 427 (S.D., Cal.) where it was said that the standard of care required of the person dealing with dangerous articles "is so great that a slight deviation therefrom will constitute negligence".

Inflammatory gas is an inherently dangerous substance. *Community Gas Co. v. Williams*, 87 Ga.App. 68, 78, 73 S.E.2d 119. The failure to odorize natural gas before distribution to consumers may constitute negligence by the wholesaler although it is a delegable one where the local distributor assumed and undertook the responsibility of odorization. *City of Villa Rica v. Couch*, 281 F.2d 284 (5th Cir.). When the contracted work involves peculiar risk of physical harm to others unless special precautions are taken, the duty is not delegable. The employer in such a case is liable for negligence of the contractor which produces a result short of the employer's duty to attain. *Community Gas Co. v. Williams, supra,* at 78, 73 S.E.2d 119.[21] The rule is summarized thusly in Restatement, Torts § 416:

> "One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

A cognate section of Restatement Second (§ 413) provides:

> "One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer
>
> (a) fails to provide in the contract that the contractor shall take such precautions, or
>
> (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions."

---

21. In a Federal Tort Claims case from Florida the Fifth Circuit has held that under the law of that state the duty of the employer to exercise ordinary care is nondelegable. *Emelwon, Inc. v. United States*, 391 F.2d 9, 11. "Florida law will not permit one to avoid responsibility for his own negligence by employing an independent contractor to perform certain hazardous activities. When the relationship between the parties is sufficiently close and the work is sufficiently hazardous, Florida applies an exception to the general rule and requires the contracting owner to act nonnegligently toward the employees of an independent contractor." *Orr v. United States*, 486 F.2d 270, 275 (5th Cir.). However, I do not rest my decision in the present case on non-delegability of safety practices under Georgia law.

### (d) Proximate Cause

■ Whether negligence (if any) by the United States was a proximate cause of the injury sued for and the legal standards of causation is governed by the law of the state where the accident occurred. 28 U.S.C. § 1346(b); *Parada v. United States*, 420 F.2d 493, 495 (5th Cir.); *Parmiter v. United States*, 75 F.Supp. 823 (D.Mass.). Since the parties agree that the controlling law is that of this State we have no "choice–of–law" problem in respect to the place where the act or omission occurred as opposed to where the negligence had its "operative effect". *Cf. Richards v. United States*, 369 U.S. 1, 10, 82 S.Ct. 585, 591, 7 L.Ed.2d 492.

■ Before any negligence can be actionable it must be the proximate cause of or part of the proximate cause of the injury received. *Lacy v. City of Atlanta*, 110 Ga. App. 814, 140 S.E.2d 144; *Rhodes v. Levitz Furniture Company*, 136 Ga.App. 514, 221 S.E.2d 687; *Davis v. Aiken*, 111 Ga.App. 505, 142 S.E.2d 112; *Tucker v. Star Laundry & Cleaners, Inc.*, 100 Ga.App. 175, 110 S.E.2d 416.

■ Under Georgia law, "proximate cause" is not the last act or cause or the nearest act to the injury. It is a negligent act that actively aids in producing the injury as a direct and existing cause. *Lewis v. Harry White Ford, Inc.*, 129 Ga.App. 318, 199 S.E.2d 599. Negligence proximately causing injury is an act that a person of ordinary caution and prudence could have foreseen that some injury might likely result therefrom. *Harris v. Hardman*, 133 Ga.App. 941, 212 S.E.2d 883; *Teppenpaw v. Blaylock*, 126 Ga.App. 576, 191 S.E.2d 466. In determining the existence of negligence, a governing consideration is what should have been reasonably foreseen. *Porch v. Wright*, 116 Ga.App. 138, 156 S.E.2d 532; *Pegg v. Knight's, Inc.*, 112 Ga.App. 437, 145 S.E.2d 632. Liability does not depend upon anticipating the particular injury or that a particular person would be injured. *Stuart v. Berry*, 107 Ga.App. 531, 130 S.E.2d 838. It is enough that by ordinary prudence the defendant could have foreseen that *some* injury or injurious consequence might have been anticipated from the act. *Ethridge v. Nicholson*, 80 Ga.App. 693, 57 S.E.2d 231; *Smith v. American Oil Company*, 77 Ga. App. 463, 49 S.E.2d 90. However, one is not required to guard against that which is only remotely and slightly probable. *Covington v. S. H. Kress & Co.*, 102 Ga.App. 204, 115 S.E.2d 621; *Hidgon v. Georgia Winn–Dixie, Inc.*, 112 Ga.App. 500, 145 S.E.2d 808.

■ The causal connection between the original negligence and the injury is not broken by the intervening act of a third person where same could have been reasonably anticipated, apprehended, or foreseen by the original wrongdoer. *Southern Railway v. Webb*, 116 Ga. 152, 42 S.E. 395; *Williams v. Grier*, 196 Ga. 327, 337, 26 S.E.2d 698; *Atlanta Baggage & Cab Company v. Atlanta Taxicabs, Inc.*, 104 Ga.App. 89, 121 S.E.2d 175; *Charles Seago Mechanical Contracting Co., Inc. v. Mobile Homes of Mississippi, Inc.*, 128 Ga.App. 261, 196 S.E.2d 346; *Hodge v. Dixon*, 119 Ga.App. 397, 167 S.E.2d 377. Proximate causation generally presents an issue of fact for jury determination. *Stern v. Wyatt et al.*, 140 Ga.App. 704, 231 S.E.2d 519.

■ Negligence of a joint tortfeasor is not, as a matter of law, too remote if it was reasonably anticipatable that negligence in creating a dangerous condition would, in conjunction with the negligent act of another, cause injury to the plaintiff. *Washington v. Kemp*, 97 Ga.App. 235, 102 S.E.2d 910; *Dills v. Cooper*, 117 Ga.App. 95, 159 S.E.2d 501.

### PART TWO

#### (16)

#### WAS THE UNITED STATES NEGLIGENT?

The Brief of the Government carefully analyzes the charges of negligence by the plaintiffs. I have already touched upon these claims in Division (13) of this Opinion. They fall into a number of categories, including:

(a) Lack of warning of the hazard involved in pyrotechnic production,

(b) Inadequacy of pre–award and post–award surveys by the Government,

(c) Design and construction of cure room,[22]

(d) Improper coordination of safety matters by reason of inadequacy of Government staffing and training of personnel,

(e) Lack of barricades immediately outside of Building M–132,

(f) Failure of Government to default Thiokol on contract for safety violations,

(g) Training of Thiokol employees in evacuation procedures,

(h) Faulty classification of illuminant hazard and failing to inform Thiokol (Woodbine) of Picatinny's upgrading in 1970 of loose, in process materials.

This Court addresses itself principally to the last mentioned claim. It seems to me that the case against the Government revolves largely around the hazard classification and notification aspects of the case.

The defendant contends that Thiokol violated certain provisions of the contract and that its violations were the sole and efficient cause of the explosion and resulting injuries to plaintiffs. It can hardly be denied that Thiokol was negligent. Its Investigation of the disaster and causes thereof was by and large an objective one. The Investigation Team found that the major contributing factors included:

"1. *Inadequate hazard classification of the illuminant material.*

The hazard classification (Class 2 Fire Hazard) ascribed to the materials and the information relative to the hazards of the materials were inadequate to characterize the dangers in manufacturing operations. The explosion, not fire, was responsible for the severity of the accident.

"2. *Inadequate separation of materials.*

The relative locations of materials resulted in fusing through the building to the cure room." Pl. Ex. 6, p. 4.

The Report concluded (p. 32) that the fusing of the contents of the cure room was caused by inadequate separation of pyrotechnic materials.

■■■ Thiokol should have been as aware as the Government in regard to the hazards inherent in the production of illuminants and the necessity of special safety precautions in the case of pyrotechnics manufacture.[23] Both maintained facilities for testing where experiments were conducted. If Thiokol and the United States were both guilty of negligent acts which operated concurrently as the proximate cause of the explosion, the Government would be liable under Georgia law for the entire damage irrespective of the degree of its fault as compared to that of a joint tortfeasor. *Isom v. Schettino, supra,* 129 Ga.App. 73, 199 S.E.2d 89; *Wilson v. Ray, supra,* 64 Ga.App. 540, 13 S.E.2d 848, I earlier pointed this out. See page 285 of this Opinion.

It appears that hazard classifications of explosives and dangerous materials are made at the highest level of the Department of Defense. See Holley dep., pp. 135–136. The United States contends that classifications for such purposes are discretionary and hence that liability cannot be predicated on any alleged faulty exercise of its discretion as to safety standards.

The establishment of hazardous classifications and the formulation of the safety requirements imposed upon contractors was pretty much under the exclusive control of the Department of the Army.[24] Picatinny

---

**22.** Plaintiff maintains that the Government approved the location of the cure room as an integral part of the operating assembly within building M–132.

**23.** At Thiokol (Longhorn) the curing or drying process of pyrotechnic mixtures took place in a separate building from that in which the consolidation was in a further stage of processing. Holley dep., pp. 227–228.

**24.** The Manual (Pl. Ex. 6) says as much. It provides in Para. 701c: "For contractor owned contractor operated plants, it is the responsibility of the Procuring Contracting Officer to determine the acceptable protection after considering the hazard involved and the risk that must be assumed."

was the center of that function. It was fully staffed with technicians. There were seven hundred employees at Picatinny. The library had an extensive collection of literature on the subject of explosives, including hazards connected with pyrotechnics. Experiments were constantly being conducted. In the field safety inspections were frequently made by technicians who visited the plants of contractors. The Army had authority and exercised it as to changing the classification of munitions and hazardous materials.

All of this indicates that the decision to upgrade was on a day–to–day, operational level rather than constituting a discretionary function of the Army.

No one can review the massive record in this case without arriving at the conclusion that the classification of loose, in–process illuminants as Class 2 materials was incorrect and that the card gap test was inadequate in the light of the experiences in the industry and the scientific experiments and writings on the subject during the 1960's. It well may be that illuminants should have had a distinct classification instead of attempting to fit them into that of "fire hazard only" and subsequently the Class 7 rating.

Certainly the materials should not have been allowed to remain in the lower classification. "After the incident, we upgraded the pyrotechnic compositions to Class 7. That essentially should prevent the sort of thing that happened at Woodbine." Fleishnick dep., p. 96.

■ Even if setting classification standards of explosives are a matter of discretion with the Army, what occurred after the decision was reached in November, 1970 to upgrade loose illuminants to Class 7 status was not within the Tort Claims exception. The decision in question was not communicated to Thiokol at the time.[25] The directive was misplaced, ignored, put aside or forgotten at Picatinny. It was delivered to the official at the Arsenal who was responsible for dissemination and was found later in a desk drawer. Notice of the decision did not reach Thiokol (Woodbine) or DCASR (Atlanta) until about seven weeks after February 3, 1971. The communication announced that all pyrotechnic compositions, in storage or process, "must be considered as Explosive Hazard Class 7, even though they have been tested here and determined by TB 700–2 to be Class 2 explosive materials."[26]

In the ambience of the evidence related to notification this Court concludes that defendant's failure to promptly notify the contractor of its critical decision to upgrade illuminants in process was a negligent act or omission by the Government and that it is within the reach of the Federal Tort Claims Act.

■ This finding is based on what is conceived to be the law of Georgia as it would be applied if an analogous case were before the courts of this State. It is not predicated on any theory of strict liability in the case of ultrahazardous operations by a contractor or nondelegability of duty as to safety or vicarious liability of the United States. What I find is that defendant's failure to timely notify Thiokol of the higher hazard classification of materials, theretofore improperly classified under incorrect DOD standards, constituted affirmative

---

**25.** It was the role of the Army Materiel Command to make hazard classifications for potentially dangerous munitions, pyrotechnics and explosives. The effect of the reclassification in November, 1970 was to return to the prior Class 7 status of illuminant changes. It was the responsibility of MUCOM to advise subordinate commands as well as private contractors of the critical change. See Queen dep., pp. 17, 34–35.

**26.** Pl. Ex. 15. Of course, there was the face-saving communication from Picatinny of February 25, 1971. It stated: "As a precautionary measure, and until such time as further evaluations or new test criteria are established, it is recommended that the unconsolidated magnesium–sodium nitrate illuminant composition be reclassified back as Class 7 material." Pl. Ex. 30.

negligence on an operational level in respect to the contractor's employees.

Liability of the United States depends, however, upon such negligence having proximately contributed to the catastrophe.

### (17)
### WAS THE NEGLIGENCE OF THE GOVERNMENT A PROXIMATE CAUSE OF THE EXPLOSION?

There is a delusive simplicity about the question of proximate cause. The problems it raises are not the subject of facile resolution. The question is a two–fold one.

First, did Thiokol's deficient housekeeping practices and its alleged violations of safety requirements imposed by the Army break the chain of causation so as to constitute the sole proximate cause of the explosion?

Secondly, assuming that there had been prompt communication of the Class 7 reclassification in the case of in process illuminants, would the changes required in the way of safety measures and precautions have been effectuated before the explosion?

### (A)
### *Negligent Acts of Thiokol as Intervening Efficient Cause of Explosion*

The Government claims that there were numerous violations by Thiokol of the standards set forth in the DOD Contractor's Safety Manual (Pl. Ex. 2) which is incorporated in the contract by reference. It contends that such violations constituted "the sole and efficient cause of the occurrence on February 3, 1971".

■ While both the United States and Thiokol have been found to be negligent, it does not necessarily follow that the Government is legally liable. A sequential issue remains. Did the contractual violations of Thiokol and its negligent operation of the

Woodbine facility represent an intervening (or superseding) proximate cause of the explosion? The negligence of the United States as a joint tortfeasor is not causally remote if the Government had "reasonable grounds for apprehending" that the intervening acts of Thiokol would have been committed. See *Milton Bradley Company of Georgia Inc. v. Cooper et al.*, 79 Ga.App. 302, 53 S.E.2d 761.[27]

First fire material is characterized by high sensitivity to ignition by friction. "When you deal with pyrotechnics and illuminants you can reasonably except fire to occur." Driscoll dep., pp. 57–58, 84. This is particularly true in their loose state because of their porosity–that is, high ratio of volume of surface exposure to mass.

The point of origin of the fire in M–132 was obviously at the dispensing station on the ignition pellet line where the operator was filling dies with the first fire addition, a boron–based ignition mixture which serves as the igniter of the trip flare. An operator at the station in question reported that a spark and fire "sprang right up from the board itself" as she was placing first fire into one of the dies that were moving along the conveyor belt. Thiokol's Standard Operating Procedure did not in any way stress the danger of ignition by friction. See Pl. Ex. 6, Appendix B–6.

Whatever its origin (defendant asserts no negligent handling at that point), the fire spread to the dies accumulated on the wooden board covering the belt rack. The dies were close to each other. The fire travelled eastwardly down the pellet line, feeding on pyrotechnic compositions along the way. They included 250 pounds of illuminants on a cart or dolly then standing in the hallway between Bays 106 and 107. It is not clear whether such material was being transferred to some other place in M–132. In the hallway near the same two

---

**27.** In that case a wholesaler sold and delivered to a retailer a toy which contained an explosive. The owner of the retail store whose young son had the run of the place took possession of the dangerous toy and threw it into the street to scare another boy. The bomb exploded and plaintiff lost an eye. He sued the wholesaler and retailer. The Court of Appeals held that a jury question was involved as to causation in the case of the wholesaler.

Bays were located large cans containing pellets.

The fire meanwhile spread down the hallways. Whether the fireball had developed at that particular time is uncertain. Apparently pressure created by the fire burst open the north door of the cure room where 8,000 pounds of Illuminant I and II were drying on trays. Also in the oven were large amounts of candles and ignition pellets and 100 pounds of first fire and intermediate mix. A diagram showing the location of flammable materials in Building M–132 reproduced from the Thiokol Investigation Report is attached below.

Fig. 7 LOCATION OF FLAMMABLE MATERIALS IN M-132
Approximate locations immediately preceding the fire on Feb. 3, 1971.

The massive explosion took place two minutes or so after the fire had initiated at the head of the assembly line. It was the result, as I have found, of the conflagration and explosion of the 8,000 pounds of illuminants in the cure room.

The principal safety violation which the Government charges against Thiokol is the improper storage of the illuminant material. Driscoll dep., p. 121. Both Class 2 and Class 7 items were in the cure room, totalling 27,600 pounds of in–process and surge materials. Of this amount, 18,100 pounds were candles and 8,000 were illuminants (both Class 2 materials). The remainder consisted of ignition pellets first fire, and intermediate mix, which belonged in Class 2.[28] Defendant urges that this storage of incompatible items violated DOD Safety Manual, Para. 704(b) which provides:

"Where items of different classes are stored together in the same building or location, applicable explosives weight for the total number of items in each explosives class will be added together to determine the total explosive weight. This total explosives weight and the tables applicable to the most hazardous class (class requiring the greater separation) shall be used to determine proper safety distances."

According to the Government, "Applying the provisions of Paragraph 704(b) this factual setting, means that on the day of the incident ... there was 27,600 pounds of Class 7 material in the cure room (Fleishnick, Tr. 145). The effect of this would mean, of course, that greater quantity–distances would be required than would be for a Class 2 material."

Defendant also contends that there was a violation of the DOD Manual, Para. 1404(f)(3) which states: "Components or assembled items shall not be allowed to accumulate in aisles or in front of exits." Defendant maintains that the improper location of explosive materials in the aisles and corridors permitted the propagation of the fire to the cure room.

The Safety Audits by Thiokol recognized the seriousness of the overload of materials in Building M–132. It was in part due to carrying on the production of the 81 mm. illuminating round in the same building. As late as January 27, 1971 the accumulation of candles and flare assemblies in the corridor was criticized in an Audit. Thiokol's Safety Director, Mr. Padgett, had previously made a number of recommendations. They were not carried out, at least in full.

After the explosion, Mr. Fleishnick listed ten violations by the Contractor of mandatory and advisory safety standards. He testified that he was not aware of the violations prior to February 3, 1971. Mr. Driscoll also disclaimed knowledge thereof. Dep., pp. 139–142. Unquestionably, good housekeeping in M–132 was lacking. Excessive or "surge" materials were stored in the building and in the cure room until needed on the line.

Safety inspections were made by DCAS–Atlanta from time to time which went quite beyond assurance of the quality of the end product contracted for. On January 12, 1971 safety engineer Driscoll visited the facility. Neither he nor the Regional Office had been apprised by AMC or by any other Army agency of the change of illuminants classification. He recommended that a placard be posted at M–132 stating the quality of materials and the number of personnel permitted in any building, room or cubicle. Dep., pp. 36–37, 39, 74. Both Mr. Galloway and Mr. Aretz testified that the housekeeping conditions in M–132 were substantially the same throughout the period. Such factors bear upon the question of foreseeability by the Government.

It is urged by the Government that Thiokol knew or should have known as well or better than Picatinny that in–process illuminants were improperly classified. That is quite true. But the Army, not Thiokol classified the pyrotechnic materials as fire hazards only. Such they were not. But the contracting parties seem to have shut their eyes to a plain danger until too late.

28. The pellets and the candles contained a sprinkling of first fire material.

The explosion was not the result of the "surge" materials in the cure room. The small scoops of first fire in the consolidated ignition pellets or the candles did not blow the building apart. Nor did the acetone which was stored in the hallway near the cure room.[29] It was the 8,000 pounds of tray illuminants which produced the enormous pressure in the confined area of the oven and the resulting massive explosion.

■ As stated, the Army's failure to implement its 1970 classification of loose illuminants amounted to affirmative or active negligence at an operational level. The effect thereof continued to the morning of February 3, 1971. It is true that Thiokol could have voluntarily treated in–process illuminants as Class 7 hazards. But this litigation is not between contractor and the United States. The plaintiffs had nothing to do with the hazard classifications. One of the expressed purposes of the Contractors' Safety Manual (Para. 103) is to prescribe methods, practices, and standards for "safe–guarding personnel". The tort liability of the United States in the case of affirmative negligence resulting in injury to personnel of a contractor is not affected by the Army Regulation disclaiming responsibility of the Government for acts or omissions in enforcing or surveilling its safety requirements. See Armed Services Regulation 7–104.79; this Opinion, p. 10. It would contravene public policy to permit parties to a contract to establish among themselves the standard of ordinary care as to third parties who are non signatories thereto and who are injured during its performance. *Stuart v. Berry, supra,* 107 Ga.App. at 534–535, 130 S.E.2d 838; *State Construction Company v. Johnson,* 88 Ga.App. 651, 656–657, 77 S.E.2d 240.

If a spark accidentally generated at the first fire station ignited the sensitive pyrotechnic material, the Government could have anticipated and foreseen that the fire would move down the pellet assembly line. At that point it might have burned itself out for lack of fuel. Unfortunately, the fire found other materials on which to feed. Greater caution by Thiokol would have prevented the disaster. But for this or but for that it would never have occurred. However, among the "ifs" is the incorrect classification of loose illuminants and the Army's failure to follow up on the Class 7 reclassification. There is ample evidence that prompt implementation would have reduced, if not eliminated, the possibility of a major explosion in the cure room.

■ This Court finds that the concurrent negligence of the United States was not superseded as a proximate cause as a result of intervening negligence and contractual breaches of Thiokol.

### (B)

WOULD THE NECESSARY CHANGES IN SAFETY STANDARDS REQUIRED BY THE CLASS 7 DESIGNATION HAVE BEEN IMPLEMENTED BEFORE THE EXPLOSION IF THIOKOL HAD BEEN TIMELY NOTIFIED OF THE ARMY'S RECLASSIFICATION?

■ According to Mr. Galloway, General Manager of Thiokol (Woodbine), if the directive of November 16, 1970 had been communicated, the operations in Building M–132 would have been closed "until correction could have been made to comply with such classification." "If we had had a change in classification to Class 7," he testified, "I would not have had the Cure Room there...."[30] Further, the pressing operations in bays 103 and 104 would have to be

---

**29.** Dr. McLain characterized the role of the acetone in the explosion as a "squeak in a thunderstorm". Testimony, pp. 62–63. Mr. Fleishnick thought that its presence could have contributed to the fire entering the cure room. Dep., p. 86. I am not impressed by the suggestion by the Government's experts at Picatinny, Dr. Burton Werbel and Dr. Francis R. Taylor, that the explosion might have been a vapor or dust explosion.

**30.** Plaintiffs argue that the change of classification, by the Government's own requirement, would have necessitated moving the cure room some 1,400 feet from the nearest inhabited building. The Government challenges this interpretation of the Q–D requirements.

"remotely controlled" and the total amount of material in the building "drastically reduced". Galloway dep., pp. 50, 110–111, 233; this Opinion at pp. 282–283. The Safety Director at Woodbine, Mr. Padgett, testified to the same effect. Dep., p. 33.

There is also the admission by Seymour Fleishnick, Chief of the Munitions Engineering Division at Picatinny Arsenal (pages 291–292 of this Opinion) that upgrading pyrotechnic compositions would essentially have prevented what took place at Woodbine.

The Research Chemist at Picatinny, Dr. Francis R. Taylor, admitted at the trial that safety considerations suggested that the cure room should have been separated from the operating building.

Dr. Burton Werber who was in Research and Development at Picatinny was asked at the trial "whether or not a cure room in which illuminants are to be cured should be located well away from operating building where personnel were in that building". He replied: "Only in very general terms. I know this to be the case ... I would say wherever possible keep material away from operating personnel." (Untranscribed tape of testimony at trial).

According to Dr. McLain, if there had been a separation, "then those people would be alive today." He pointed out also that a frangible roof and a breakaway wall were appropriate precautions. McLain testimony, pp. 47, 55–57; 93–95, 218.[31] He stated that the cost of erecting another building was a matter of negotiation which necessitated a change order under Thiokol's fixed price contract. Testimony, p. 128; see this Opinion, p. 283.

Charles F. Otken, Chief of the Commodity Procurement Division at Picatinny Arsenal, testified that upgrading the composition pyrotechnic material from Class 2 to Class 7 would have been followed by a letter to Thiokol (Woodbine) with opportunity to respond as to what effect it would have upon cost and delivery. "[I]f we had

been told by the safety people," Otken said, "to put it in the contract, we would have negotiated a change in the contract with the contractor." Dep., pp. 87, 82.

By November, 1970 Thiokol had a $375,000 overrun on its contract. Gov't. Ex. 4. Two days before the explosion, the figure was a million dollars. Gov't. Ex. 6; this Opinion, p. 283.

The changeover to conform to the Class 7 rating would undoubtedly have entailed additional costs to the contractor. Thiokol might not have accepted the directive. See p. 283 of Opinion. Negotiations are time consuming and so is the construction of new facilities or the rearrangement of existing ones. In short, it is possible that Thiokol could not or would not have adjusted to the requirements necessitated by the higher classification in the seven weeks between November 16th and February 3rd.

Against such possibility must be weighed what I think is the more likely effect of notification that loose illuminants had been upgraded to Class 7. I find it difficult to believe that such a change would have been disregarded by Thiokol. Apart from what the officials of the Company testified as to what effect the Army's reclassification would have had, the reaction would probably have been to take corrective steps. Short of closing down the operation, the cure room could have been separated. Its exposure to fire could have been minimized by a door swinging outwardly instead of inwardly. However, the separation of the cure room from Building M–132 is by far the most important safety measure that could have been taken.

I conclude that the evidence leans more to probability than improbability of the explosion not occurring had Thiokol been timely notified as to the new Class 7 designation of loose illuminants.

Plaintiffs have carried the burden of proof that the negligence of the defendant was a concurrent, proximate cause of the

31. The Government contends that Building M–132 already had a frangible roof, 9 lbs. per square foot as against a standard of 10 lbs. in

the case of detonation of explosives greater than 100 pounds. Gov't. Ex. 82.

explosion and that the causal effect was not broken by the intervening negligence of Thiokol.

## PART THREE

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The findings and conclusions which appear throughout the foregoing 65 pages represent sufficient compliance with Rule 52(a), F.R.Civ.P. However, at the expense of repetition as well as elongation of this decision, I formalize and abridge what this Court has found and held as to the controlling issues of fact and law in this case. They are to be considered along with and in the light of the findings and conclusions that appear in the Opinion and not as a substitute therefor.

### I

### FINDINGS OF FACT

1. Under the trip flare contract with the Army, Thiokol's legal status was that of an independent contractor. The evidence is insufficient to bring the United States within any of the conditions of Ga.Code Ann. § 105–502 under which an employer becomes liable for the negligence of an independent contractor. However, the theory on which plaintiffs are proceeding is that while the contractor (Thiokol) was at fault, the Government was itself guilty of independent, active negligence proximately contributing to the injuries. They contend that the United States and Thiokol were joint tortfeasors.

2. The origin of the fire was the ignition of first fire powder by friction or impact at the addition station. The material is highly sensitive to friction. Small fires in pyrotechnic production are not infrequent in the industry and had been experienced a number of times at the Woodbine facility. Opinion, p. 274. The Government does not claim negligence at the first fire station as the proximate cause of the fire.

3. The fire ran down the pellet ignition assembly line and apparently spread to containers of ignition pellets and to a rack of granulated illuminant located on a cart in the area of the cure room. It evidently burst through the door of the oven where 8,000 pounds of trayed illuminants (and other Class 2 and a small amount of Class 7 materials) were located. The ensuing rapid deflagration of the mass of in–process illuminants resulted in extreme over pressure. It was followed by the explosion which destroyed Building M–132.

4. Underlying causes of the disaster at Woodbine were (1) a faulty hazard classification of illuminant material and a lack of recognition of the danger from explosion rather than fire and (2) the location of materials in M–132 which fed the fire. See pp. 274–275 and pp. 293–294 of Opinion.

5. The Army possessed the power and responsibility of making and changing classifications of potentially dangerous munitions, pyrotechnics and explosives and exercised such authority. See Opinion, pp. 282; 291; Contractors' Safety Manual, Pl. Ex. 6.

6. The 1967 decision of the Army to downgrade loose, in–process illuminants from Class 7 to Class 2 was an incorrect one and was based on inadequate standards. In–process illuminant materials should have been given the highest hazard classification.

7. The "card gap" test which was the basis for the Army's determination of whether material is a "Mass Detonating Hazard" (Class 7) or merely a fire hazard (Class 2) is inadequate for purpose of classifying the hazard of illuminants. A Government witness as well as counsel for the defendant conceded as much. Opinion, pp. 276–277; 279; 280, n.13.

8. Thiokol was negligent in the processing and handling of illuminant materials. Its safety practices were faulty in permitting storage of "surge" in the hallways and in the cure room of M–132. It inadequately enforced safety rules. Thiokol was also negligent in persistently treating in–process illuminant materials as Class 2 items when it was aware of their explosive qualities under certain conditions and the fact that

they properly belonged in the Class 7 hazard status. Such negligence was one of the proximate causes of the injuries to plaintiffs.

9. Thiokol was as at fault in failing to recognize the erroneousness of a Class 2 classification for in–process illuminants. The Company maintained research facilities and a safety department. It had undertaken illuminant explosion tests at its Texas and Utah facilities. It certainly was aware in 1968 and 1969 that the ignition of untamped illuminant produces extremely rapid deflagration with explosive effects and a shock wave of devastating proportions. Opinion, pp. 280–281. Furthermore, the Government either knew of that fact or should have known thereof in the exercise of ordinary care.

10. The United States was also negligent and its independent acts of negligence concurred with that of Thiokol. They were joint tortfeasors under Georgia law.

11. In October of 1970 there went through channels to the Commanding General, U.S. Army Materiel Command, from Munitions Command, a report and recommendations dated October 29, 1970. It stated in part:

"It is recommended that pyrotechnic compositions no longer be tested in accordance with the procedures given in Army Bulletin TB 700–2, Chapter 3. It is further recommended that an interim hazard classification of Class 7 be assigned to loose pyrotechnic compositions during handling, storage and transportation, until more meaningful tests can be adopted.

"Picatinny Arsenal in its hazard classification program is developing a series of tests which will determine the deflagration to detonation characteristics of pyrotechnic compositions. These tests include rates of detonation, confined ignition temperature and pressure–time behavior under heavy confinement. Those compositions which appear to detonate, low to high order, will be tested for TNT equivalency for potential damage assessment. It is believed that the data obtained from these tests will give more meaningful criteria for hazard classification of pyrotechnics."

12. It was not until March 25, 1971 that Thiokol was notified of the action taken by AMC in November to the effect that all pyrotechnic compositions, in storage or process, "must be considered as Explosive Hazard Class 7, even though they have been tested here and determined by TB 700–2 to be Class 2 explosive materials." On February 25, 1971, one month before, the commanding officer at Picatinny had informed the General Manager of the Georgia Division of Thiokol that "As a precautionary measure, and until such time as further evaluations or new test criteria are established, it is recommended that the unconsolidated magnesium–sodium nitrate illuminant composition be reclassified back as Class 7 material." See this Opinion, pp. 281–282.

13. According to the Chief Safety Officer of the AMC, it was ordinarily expectable that all operating levels, whether military or private, would have been advised of that decision by AMC and NUCOM. Neither Thiokol nor DCASR (Atlanta) was notified. The normal procedure would have been to send it "directly to Thiokol–Woodbine with a copy to DCASR–just to alert them." It is not clear what happened after the upgrading decision on November 16, 1970. It was forwarded to the Pyrotechnic Laboratory at Picatinny. There is a suggestion in the record that it went to an official of the Arsenal and apparently the document was found in his desk after the disaster. He was then residing in Tel Aviv and was not available to testify. See Opinion, pp. 281–282, 292.

14. Numerous negligent acts by the defendant are relied on by plaintiffs. Some of them are not cognizable by this Court as the acts or omissions in controversy fall within the "discretionary" exemption of the Federal Tort Claims Act. Others fail to meet the affirmative act of negligence standard required in actions brought against the United States under that statute.

15. This Court predicates its finding against the United States in this case on its persistent reliance upon an inadequate fire-hazard–only status of loose illuminants and its negligent act or omission in failing to implement, by notice or otherwise, its high level 1970 decision changing the classification of pyrotechnic materials to Class 7.

16. The Government's failure to timely communicate to Thiokol its critical decision upgrading the materials to Class 7 constituted affirmative, negligent acts and omissions on its part occurring on the operational level.

17. The evidence preponderates in favor of the factual conclusion that if the change in classification had been communicated to Thiokol it would have reacted by complying with the direction. According to evidence this Court accepts, measures would have been taken to adjust to the safety standards and procedures called for by the upgrading of the material from "fire hazard only" to the highest hazard classification. See pp. 282–284 of this Opinion.

18. The negligence of the United States concurred with that of its joint tortfeasor and constituted a proximate cause of the injuries to plaintiffs. The causal connection between their independent acts of negligence was not broken by intervening negligence of Thiokol. In the light of the defendant's knowledge of its Contractor's operations and of the physical setup of the facility (M–132), it had reasonable grounds for apprehending that the intervening acts of Thiokol would occur.

## II

## CONCLUSIONS OF LAW

1. Thiokol cannot be sued as a joint tortfeasor because of the exclusivity provision of the Workmen's Compensation Act. Its immunity from a tort action by an injured employee does not affect the liability of the United States for its independent acts of negligence. The Georgia Workmen's Compensation Act expressly preserves a right of action by an employee "against any third-party tortfeasor". Ga.Code Ann. § 114-

103; *Echols v. Chattooga Mercantile Company, supra,* 74 Ga.App. at 24–25, 38 S.E.2d 675; *Williams Bros. Lumber Co. v. Meisel, supra,* 85 Ga.App. 72, 75, 68 S.E.2d 384; *Georgia Power Company v. Diamond et al., supra,* 130 Ga.App. at 269, 202 S.E.2d 704; *Sims et al. v. American Casualty Company et al., supra,* 131 Ga.App. at 468, 206 S.E.2d 121.

2. The governing law in actions against the United States under the Federal Tort Claims Act is that "of the place where the act or omission occurred". *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805. Whether negligence is a proximate cause of the injury sued for as well as the legal standards governing causation is controlled by the law of this State in which the accident occurred. 28 U.S.C. § 1346(b); *Parada v. United States,* 420 F.2d 493 (5th Cir.); *Parmiter v. United States,* 75 F.Supp. 823 (D., Mass.).

3. The doctrine of strict or absolute liability where ultrahazardous activity is involved does not apply to the Federal Tort Claims Act. *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427. "The legislative history discussed in *Dalehite* indicates that Congress intended to permit liability essentially based on the intentionally wrongful or careless conduct of Government employees, for which the Government was to be made liable according to state law under the doctrine of *respondeat superior,* but to exclude liability based solely on the ultrahazardous nature of an activity undertaken by the Government." *Laird, Secretary of Defense v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499.

4. Under Georgia law a plaintiff in the case of joint tortfeasors "can pick out whomever he pleases to sue who is liable . . . He has his choice." *Wilson v. Ray, supra,* 64 Ga.App. at 543, 13 S.E.2d at 850. There may be a recovery against either or both of the responsible parties where their separate and independent acts concur to produce a single injury. This is true although the injury may not have happened had only one

302

of the acts of negligence occurred and although the duty owed by each defendant may not be the same. *McBerry et al. v. Ivie, supra,* 116 Ga.App. at 812, 159 S.E.2d 108. "Where one is injured by the concurring negligence of two tortfeasors, each is liable for the whole injury although the other defendant may have contributed thereto in greater degree." *Isom v. Schettino, supra,* 129 Ga.App. at 76, 199 S.E.2d at 93. Even where the negligence of one tortfeasor is only 3% and that of the other is 97%, the former is jointly and severally liable under Georgia law for the entire verdict. *Gates v. L. G. DeWitt, Inc., supra,* 528 F.2d at 413 (5th Cir.).

5. Under the Federal Tort Claims Act the United States is not liable in claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). However, in *Indian Towing Co., Inc. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, the Supreme Court drew this distinction:

"The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act."

6. In *Smith v. United States, supra,* 497 F.2d 500 the Fifth Circuit indicated that the Government cannot be found liable merely because it had knowledge of a dangerous procedure and failed to rectify same. Nor is the United States liable for inspecting the work or when no more than omission or inaction is involved. Such decisions may be on the discretionary level. But where the Government devises and instructs as to a dangerous procedure, it is liable for the negligent direction thereof. Such is an affirmative act of negligence on the operational level for which the Government is responsible, the Court of Appeals ruled.

7. Retaining the right under the contract to inspect the work; issuance of regulations and a manual relating to a safety program; having a safety inspector on the job, and failing to stop the work do not in themselves create liability by the Government to an employee of the independent contractor. *Market Insurance Company v. United States, supra,* 415 F.2d 459 (5th Cir.); *Toppi v. United States, supra,* 327 F.Supp. at 1279 (E.D., Pa.); *Fisher v. United States, supra,* 441 F.2d 1288 (3rd Cir.); *Roberson v. United States, supra,* 382 F.2d 714 (9th Cir.).

8. One of the expressed purposes of the Contractors' Safety Manual (Para. 103) is to prescribe methods, practices, and standards for "safe–guarding personnel". The tort liability of the United States for affirmative negligence by it causing injury to personnel of a contractor is not affected by the Army Regulation (Armed Services Regulation 7–104.79) disclaiming responsibility of the Government for acts or omissions in enforcing or surveilling its safety requirements. It would contravene public policy to permit parties to a contract to establish between themselves the standard of ordinary care as to third parties not signatories thereto who are injured during its performance. *Stuart v. Berry, supra,* 107 Ga.App. at 534–535, 130 S.E.2d 838; *State Construction Company v. Johnson, supra,* Ga.App. 651, 656–657, 77 S.E.2d 240.

9. Under Georgia law, the defendant's duty in the case of dangerous materials is one of ordinary and not extraordinary care. *Hand v. Harrison, supra,* 99 Ga.App. 429, 108 S.E.2d 814; *Lemming v. J. P. Roberts & Sons, Inc., supra,* 130 Ga. at 569, 203 S.E.2d 898. Ordinary care, however, "as to a thing which is subtle, violent and dangerous . . .

may require a greater degree of caution than does an agency which lacks these dangerous propensities." *Womack v. Central of Georgia Gas Company, supra,* 85 Ga.App. at 803, 70 S.E.2d at 403; *Reddick v. White Consolidated Industries, Inc., supra,* 295 F.Supp. at 245.

 10. Since Thiokol and the United States were guilty of negligent acts that operated concurrently as the proximate cause of the explosion, the Government is liable under Georgia law for the entire damage irrespective of the degree of its fault as compared to that of a joint tortfeasor. *Isom v. Schettino, supra,* 129 Ga. App. 73, 199 S.E.2d 89; *Wilson v. Ray, supra,* 64 Ga.App. 540, 13 S.E.2d 848.

11. The causal connection between the original negligence and the injury is not broken by the intervening act of a third person where same could have been reasonably anticipated, apprehended, or foreseen by the original wrongdoer. *Southern Railway v. Webb, supra,* 116 Ga. 152, 42 S.E. 395; *Williams v. Grier, supra,* 196 Ga. 327, 337, 26 S.E.2d 698; *Atlanta Baggage & Cab Company v. Atlanta Taxicabs, Inc., supra,* 104 Ga.App. 89, 121 S.E.2d 175; *Charles Seago Mechanical Contracting Co., Inc. v. Mobile Homes of Mississippi, Inc., supra,* 128 Ga.App. 261, 196 S.E.2d 346; *Hodge v. Dixon, supra,* 119 Ga.App. 397, 167 S.E.2d 377. The causal connection is not destroyed by the intervening act of a joint tortfeasor if the original wrongdoer had "reasonable grounds for apprehending" that such act would have been committed. *Milton Bradley Company of Georgia Inc. v. Cooper et al., supra,* 79 Ga.App. 302, 53 S.E.2d 761. See also pp. 51–52 of Opinion. Negligence of a joint tortfeasor is not, as a matter of law, too remote where it was reasonably anticipatable that negligence in creating a dangerous condition would, in conjunction with the negligent act of another, cause injury to the plaintiff. *Washington v. Kemp, supra,* 97 Ga.App. 235, 102 S.E.2d

.910; *Dills v. Cooper, supra,* 117 Ga.App. 95, 159 S.E.2d 501.

### ORDER

Judgment will be entered consistent with this Opinion and the findings and conclusions herein. A conference will be held at an early date in regard to the further course of this litigation.